# LEWIS (A SLAVE) vs. THE STATE.

[INDICTMENT FOR ATTEMPT TO COMMIT RAPE.]

1. *Relevancy of evidence sustaining impeached witness.*—A witness having been questioned, on cross-examination, as to his testimony before the committing magistrate, and having admitted that he then made statements inconsistent with his testimony on the trial, may, on re-examination, state that such former testimony was induced by threats of personal violence on the part of an opposing witness.

2. *Same.*—When a witness has denied, on cross-examination, that he attempted to suborn an opposing witness by threats of personal violence, and has been discredited on that point, he may be sustained by proof of his general character for truth and veracity.

3. *What constitutes attempt to commit rape.*—Although an indecent advance or importunity is not, of itself, sufficient to constitute an attempt to commit a rape, under section 3307 of the Code ; yet, if the prisoner intended to have carnal knowledge of the prosecutrix by violence, and against her consent, and manifested his purpose by outward acts so far as to put her in terror, and to render flight on her part necessary to her escape from his attempt, he is guilty of the offense denounced by the statute, and a subsequent abandonment of his purpose cannot purge the crime, although the fact that he vol-

untarily desisted from his pursuit of the prosecutrix, when the accomplishment of his purpose was probably or even possibly attainable, should weigh much in his favor.

4. *Sufficiency of indictment.*—An indictment under section 3307 of the Code, charging that the prisoner "attempted to commit a rape on M. C., a white female," is sufficiently certain and definite under the provisions of the Code.

Error to the Circuit Court of Talladega.

Tried before the Hon. Nat. Cook.

The indictment in this case charged, that the prisoner, "Lewis, a slave, the property of Henry Harless, attempted to commit a rape on Mary C. Ozley, a white female;" and was found at the spring term, 1857, of the circuit court of Shelby. The venue was changed, on the prisoner's application, to Talladega county, where the trial was had, at the fall term, 1859, on the plea of not guilty. The rulings of the court on the trial are thus stated in the bill of exceptions:

"It was proved, that Mr. Ozley, the father of the young lady on whom the supposed rape is charged to have been attempted by the prisoner, resided about three miles from Mr. A. P. Butler; that the road leading by the houses of said Ozley and Butler passed within about a half-mile of the house of George Harless; and that a field belonging to said Harless ran up to said road, about opposite his house. Miss Mary C. Ozley, a witness on the part of the State, testified, that she left the house of Mr. Butler, after ordinary breakfast, on the morning of the 25th July, 1856, accompanied by a white boy some nine or ten years old, to go to her father's; that she walked, while the boy was riding on a pony; that as they were passing the field of said Harless, and about opposite to his house, she met Michael Busby, a young man who was living with said Harless; that she met him not far from where the road leading from said Harless' comes into the road which she was traveling; that he had a yoke of oxen; that she did not stop, but walked at an ordinary gait along the road towards her home; that after going about three quarters of a mile beyond where she met Busby, she saw a negro man, sitting near a sink-hole, thirty or forty yards from

the road, who had on no clothing except a shirt; that her attention was called to him, by his saying 'Stop, gal, aint you going to stop'? that she then commenced running, and he ran towards her; that she ran along the road, and frequently looked back at him; that the negro continued to run after her for more than a mile, and then stopped; that there was no house nearer to where he stopped than a half-mile: that he looked after her, and said, 'Stop, gal, aint you going to stop'? that he repeated this many times, and spoke like he wanted her to stop, but never used any other language; that he was never nearer to her, from the time she first saw him, until she left him standing where he stopped, and where she last saw him, than ten steps; that she frequently called her father while running; that when she got on top of a ridge, within a half-mile of her father's house, she looked back, and saw the negro within ten steps of her; that she called loudly for her father, and continued to run, and, on looking back again, saw him standing and looking at her; that she ran on, halloing for her father, until she got within a quarter of a mile of home, when she met her father; and that, in her opinion, the prisoner was the negro who thus pursued her. The boy, stated by Miss Ozley to have been with her, was not introduced as a witness; nor was any other witness examined who saw her running, or who saw the prisoner or any one else pursuing her, or who saw any of the things above detailed by her.

"George Harless, who was examined as a witness by the prisoner, testified, that he had hired the prisoner from his father, and had him living with him on the 25th July, 1856; that he lived about a half-mile from the road leading from Butler's to Ozley's, and had a field which ran up to the said road, and which he was then using as a pasture; that said pasture was entered by means of a gap on the said road, and, to reach it from his house, one had to go into the road, and then travel along said road, from sixty to one hundred yards, towards Butler's, to the gap; that it was about one mile and a quarter from his house to the sink-hole described by Miss Ozley, as being the place where she first saw the negro; that on the morning

of the 25th July, 1856, after ordinary breakfast, he directed said Busby, who was then living with him, to take a yoke of oxen to the said pasture, and turn them in; that he saw Busby start, with the oxen, in the direction of the said pasture, and, after Busby had been gone long enough to have returned, he saw the prisoner at the house, watering horses at the well. Said witness was asked, on cross-examination, if he had not told said Busby, at a time and place which were specified, that he (Busby) must swear that he saw the prisoner at the house after he had carried the oxen to the pasture and returned; to which he answered, that he had not. He was then asked, (it being shown that his father, the owner of the slave, had died, and that he was one of his executors,) if he had not said since the commencement of this prosecution, at a specified time and place, that he would acquit the prisoner, or would spend his father's estate; to which he answered, that he had not. The State then introduced said Busby as a witness, who testified, that he was living with said George Harless on the 25th July, 1856; that he saw the prisoner, just after breakfast on that morning, going from the house of said Harless, in the direction of the road leading from Butler's to Ozley's; that the prisoner had got about one hundred and fifty yards from the house when he saw him, and he did not see him again until night; that after he had seen the prisoner thus leave, Harless told him to carry a yoke of oxen to the pasture; that he took the oxen to the pasture, and went in the direction he had seen the prisoner go, but saw nothing more of him; that to reach the pasture, he had to travel about a half-mile from Harless' house into the road leading from Butler's to Ozley's, and then along said road, one hundred yards or more, to the gap; that when he had got into said road, and had gone along it about sixty yards, he met Miss Mary C. Ozley, who was afoot, and accompanied by a little son of Mr. Butler's who was on a pony, going towards Mr. Ozley's; that he put the oxen in the pasture, and returned to the house of said Harless by the same way he went, but saw nothing more of Miss. Ozley or the prisoner, nor did he see the prisoner when-

he reached the house of said Harless. The prisoner thereupon introduced the sworn testimony of this witness on the preliminary examination, as taken down in writing under the statute, wherein he stated, 'that he met Miss Ozley and Mr. Butler's little son, on the morning of the 25th July, 1856, in the road leading from Butler's to Ozley's, when he was going with the oxen to the pasture; that he was within about sixty yards of the gap when he met them; that they were going towards Ozley's; that he put the oxen in the pasture, and returned by the same way, but saw nothing more of Miss Ozley, and that he found the prisoner at Harless' house when he got back there'. The prisoner then asked said witness, if he did not swear on said preliminary examination. as therein stated; and the witness answered, that he did. The prosecuting attorney then asked the said witness, why he had so sworn on the preliminary examination; and the witness answered, 'because George Harless told him to swear it, and that he would whip him if he did not.' The prisoner objected to this question and answer, separately, on the ground that they were illegal and irrelevant; but the court overruled each objection, and allowed the evidence to go to the jury in explanation of the witness' testimony; to which the prisoner excepted. The prisoner then introduced a witness who testified, that he was well acquainted with the general character of said George Harless, in the neighborhood in which he lived, for truth and veracity; that his said character was good, and that from that general character he would believe him on oath in a court of justice. The court excluded this evidence from the jury, on motion of the prosecuting attorney, and the prisoner excepted to its exclusion.

" Among other written charges, the prisoner asked the following: ' 1. Should the jury believe from the evidence that the prisoner pursued Miss Ozley, yet, if he was never nearer to her than ten steps, and if they believed that he could have approached nearer to her, if he had desired to do so, but did not do it, then this would not constitute an attempt to commit a rape'. ' 2. Although the jury might believe from the evidence that the prisoner pursued Miss

Ozley, and commenced the pursuit with the intent to gratify his passions upon her with violence, if necessary; yet, if they are satisfied from the evidence that he was never nearer to her than ten steps, and that he could have caught her, if he had desired to do so, and that he voluntarily changed his mind, and abandoned his purpose, then he would not be guilty of the offense charged.' The court refused to give each of these charges, and the prisoner excepted to their refusal."

After conviction, the prisoner moved in arrest of judgment, on account of the insufficiency of the indictment, and reserved an exception to the overruling of his motion.

JAMES B. MARTIN, for the prisoner.

M. A. BALDWIN, Attorney-General, *contra*.

STONE, J.—Michael Busby and George Harless were examined as witnesses in the trial of this cause; the former for the prosecution, and the latter for the defense. An attempt was made to discredit Busby, by proving that in his deposition before the committing magistrate, he had made statements contradictory of his testimony on the trial in chief. As a predicate for introducing the deposition, the witness Busby was asked as to his former testimony, which he admitted. On re-examination, he was asked why he had testified as his deposition disclosed, and answered, that George Harless, the other witness, had told him to swear it; and that if he did not, he would whip him. Harless, who had been previously interrogated, denied on oath that he had thus tampered with the witness Busby. Thereupon, the defendant offered evidence to sustain the general credibility of the witness Harless; the testimony was excluded by the court, and we are now asked to decide whether such evidence was admissible.

We entertain no doubt that the circuit court ruled correctly on every question connected with this branch of the present case, except the last—namely, its refusal to receive evidence of the general credit of the witness Harless, and that on this point the court erred. The

only sensible reason for requiring that, before a witness is attempted to be discredited by proof of previous contradictory statements, he shall be asked on oath in regard to such statements, is, that he may have the opportunity of explaining such apparent contradiction.—See the Queen's case, 2 B. & B. 311. The court rightly ruled in this case, that Mr. Busby should be permitted to explain such contradiction, if he could.

In offering his explanation, he inculpated the witness Harless, by testifying that he (Harless) had interfered actively to corrupt him, the said Busby. Harless, on his examination, had been interrogated as to such attempt to corrupt Busby, and had denied it. This preliminary examination was proper. The result of the whole matter was, that the defendant had attempted to discredit Busby, by proving his prior contradictory testimony; and the prosecution sought to discredit Harless, by testimony tending to prove that he had attempted to corrupt the witness Busby.

In Morgan v. Frees, 15 Barb. (Sup. Ct.) 352, it was ruled, that when a witness has attempted to suborn a witness to swear falsely in the cause, and, on cross-examination, denies that he has done so, the opposing party may give evidence to contradict him in that respect. The court say, "such evidence is addressed to his conduct in the particular suit, and ought to detract very much from his credit."—See, also, Yervin's case, 2 Camp. 637; Atwood v. Welton, 7 Conn. 66.

Testimony having been adduced tending to discredit the witness Harless, it was competent to introduce evidence to sustain his general credit as a truthful witness. Hadjo v. Gooden, 13 Ala. 718; 1 Greenl. Ev. § 468; 2 Phil. Ev. (4th Amer. ed.) 961-2; Melhuish v. Collier, 15 Ad. & El. N. S. (69 Com. Law,) 878.

[3.] The question of the sufficiency of the indictment, and the refusal of the court to give the charges asked, render it necessary that we shall define the word *attempt*, in section 3307 of the Code. That section reads as follows:

"Every slave, or free negro, who commits, or attempts

to commit, a rape on any white female, must, on conviction, suffer death."

It is urged for plaintiff in error, that there can be no attempt, under this section of the Code, without at assault. If this argument be sound, then the word *attempt* in this statute is the synonym of 'assault with intent,' as it is manifest there can be no attempt to commit a crime, unless the perpetrator actually intend to commit that crime. Against this construction we may be permitted to remark, that in the very article, and on the very page on which section 3307 of the Code occurs, are found the words *attempt*, and *assault with intent*, as descriptive of offenses by slaves. Section 3311 contains both forms of expression, in describing two several offenses. The word *intent* occurs in sections 3311 and 3312. The word *attempt* occurs in section 3307 and 3311. Section 3306 denounces "consulting or conspiring to rebel" as a capital offense. It is manifest that, to consult or conspire, does not imply the performance of any physical act; while attempts, and assaults with intent, do imply physical exertion. If the word *attempt* was used as the synonym of assault with intent, why did the legislature employ one form of expression in two of the offenses provided for on page 594 of the Code, and the other in describing other offenses on the same page? The fact that the two forms of expression were employed in such close proximity, furnishes strong persuasive evidence that a different meaning was attached to each.

A further argument against this construction: The word *attempt* in section 3311 is evidently used in a sense different from an assault with intent. Slaves may attempt to poison, and may thus incur the penalty provided by that section, without committing an assault. If, then, we give to the word *attempt*, in section 3307, the meaning which is obviously the true sense of the same word in section 3311, an attempt to commit a rape by a slave on a white female may be complete within the statute, and yet no assault be actually committed.

The word attempt, in its largest signification, means a trial or physical effort to do a particular thing. Mr.

Bishop, in his excellent treatise on Criminal Law, says: "When we say that a man attempted to do a thing, we mean that he intended to do specifically it, and proceeded a certain way in the doing. The intent in the mind covers the thing in full; the act covers it only in part." 1 Bish. Crim. Law, § 511.

In the kingdoms of continental Europe, this subject seems to have received particular attention.—See 1 Bishop's Crim. Law, § 512, and note. In the Spanish Code, it is declared, that "criminal attempt is a direct commencement of execution, by external acts, the realization of which is hindered by causes independent of the will of the author."

Judge Ruffin, of the supreme court of North Carolina, said, "Attempt is expressive rather of a moving towards doing the thing, than of the purpose itself. An attempt is an overt act itself."—The State v. Martin, 3 Dev. Law, 329. See, also, Uhl v. Commonwealth, 6 Gratt. 710; State v. Davis, 1 Ired. Law, 125; Morton v. Shopper, 3 Car. & Payne, 373; Stephens v. Myers, 4 Car. & P. 349; Rex v. Higgins, 2 East, 12.

We are unwilling to lay down a rule, applicable to all cases, for determining when attempts have proceeded so far as to be within the punitive provisions of the law. Much must depend on the nature of the act attempted. We hold, that if Lewis, the slave, actually intended and attempted carnally to *know* the prosecutrix, by violence and against her consent, and prosecuted his purpose so far as to put her in terror, and render flight necessary to escape from his wicked attempt, then he was guilty of an attempt to commit a rape, within the meaning of the statute. To justify his conviction, however, the jury must be satisfied, beyond a reasonable doubt, that such was his purpose, and that his attempt had this extent. An indecent advance, or importunity, however revolting, would not constitute the offense.

In what we have said, we do not wish to be understood as intimating any opinion on the probabilities or improbabilities of the defendant's guilt. That question is not

for our determination. We are simply declaring a rule, to be observed in another trial of this case.

We deem it unnecessary to announce any opinion on the charges asked and refused, further than to say, if the attempt was in fact made, and had progressed far enough to put Miss Ozley in terror, and render it necessary for her to save herself from the consummation of the attempted outrage by flight, then the attempt was complete; and an after-abandonment by the defendant of his wicked purpose, if it had proceeded thus far, could not purge the crime. To bring the case within this principle, there must have been an intention, and an actual attempt to have carnal knowledge of her, by force and against her consent.—Lewis v. The State, 30 Ala. 54.

On the trial, the jury should be instructed to give due consideration to the manner of the slave—to the character of his pursuit, whether earnest and active, or dilatory—in determining whether he intended and attempted, within the rule above declared, to have carnal connection with Miss Ozley, by force, and against her consent. If the proof shows that Lewis voluntarily desisted from the pursuit, when the accomplishment of his imputed purpose was probably, or even possibly attainable, this is a circumstance which should weigh much against the truth of the charge contained in the indictment. On the contrary, if he abandoned the pursuit, because he was unable to overtake Miss Ozley, or because he feared to proceed further, lest he should encounter other opposition, then the fact that he desisted should weigh nothing in his favor.

[4.] In the case against Anthony, 29 Ala. 27, the indictment was framed under section 3311 of the Code. What we there said can shed no light on the sufficiency of this indictment, which rests on section 3307 of the Code. There is nothing said in that opinion, which, rightly construed, requires, even in a proceeding under section 3311, that the indictment shall express the degree or extent of action performed by the defendant, in the alleged attempt to poison. The word attempt was there understood to express that degree and extent, with sufficient definiteness.

So, in this case, we hold that an indictment, under section 3307 of the Code, need not aver how near to its full accomplishment the attempted rape had been carried. Having shown that a slave may be guilty of an attempt to commit a rape on a white female, without actually assaulting her, if we were to go further, and require that the indictment shall express the particular acts of which the attempt consists, we should greatly innovate on our present brief and simple forms of indictment, and introduce a particularity of averment and description, which would, in many cases, amount to a denial of justice.—See forms of indictments, page 698 of the Code; also, § 3503. The indictment in this case is sufficient.—Rex v. Fuller, 1 Bos. & Pull. 180; Lawson v. State, 20 Ala. 65; Sterne v. State, *ib.* 43.

The judgment of the circuit court is reversed, and the cause remanded. Let the prisoner remain in custody until discharged by due course of law.