William Ray Minshew, the appellant, was convicted of the attempted murder of his ex-wife, Karen Hartley.[1] He was sentenced to life imprisonment without parole as a habitual offender. He raises six issues on this appeal from that conviction.
 I
The appellant contends that the evidence is insufficient to support his conviction of attempted murder because, he argues, the State proved neither his specific intent to kill his former wife nor an overt act in part execution of that intent.
"In Alabama, a person commits the crime of attempt to murder if he intends to cause the death of another person and does any overt act towards the commission of that intent. Alabama Code 1975, Sections 13A-4-2 (the attempt statute), and 13A-6-2
(murder)." Chaney v. State, 417 So.2d 625, 626-27 (Ala.Cr.App. 1982). See also Barnes v. State, 571 So.2d 372, 374
(Ala.Cr.App. 1990). "Attempted murder is a specific intent crime. . . . An attempt to commit murder requires the perpetrator to act with the specific intent to commit murder. . . . A general felonious intent is not sufficient." Free v.State, 455 So.2d 137, 147 (Ala.Cr.App. 1984). To establish a prima facie case of attempted murder, the State must present evidence of the accused's specific intent to kill, and of "some overt act in part execution of the intent to commit the crime . . . which falls short of the completed crime; the difference between attempt and commission being that the act or step fails to produce the result intended." Broadhead v. State,24 Ala. App. 576, 139 So. 115, 117 (1932).
The appellant and Karen Hartley were married in March 1986. They lived together for six to eight weeks before Ms. Hartley left and moved in with her mother. In May 1986, when Ms. Hartley attempted to remove her personal effects from the apartment in which she and the appellant had been living, the appellant blocked the doorway. Ms. Hartley had to enlist the aid of the sheriff in order to obtain her belongings.
On a night in June 1986, the appellant was waiting behind a shed when Ms. Hartley returned to her mother's residence. Upon seeing the appellant, Ms. Hartley remained in her automobile and locked the doors. The appellant "pounded" and "banged" on the vehicle before Ms. Hartley pulled out of the driveway and drove to get the police. The appellant, armed with a knife, then forced his way into the residence of Ms. Hartley's mother and stepfather and assaulted her mother, Mildred Henderson. This conduct resulted in his conviction for first degree burglary. See Minshew v. State, 542 So.2d 307 (Ala.Cr.App. 1988).
After June 1986, Ms. Hartley made several attempts to reconcile with the appellant. She lived with him in Birmingham for a two-week period and she continued to see him while she stayed with her sister in Mobile for several weeks. These reconciliation efforts apparently lasted until September or October 1986, when Ms. Hartley told the appellant their relationship was over.
In October 1986, the appellant again broke into the Henderson residence. On *Page 705 
that occasion, Ms. Hartley, her mother, and her stepfather were present. The appellant, armed with a .38 caliber pistol, threatened to kill Mr. and Mrs. Henderson unless Ms. Hartley accompanied him to an upstairs bedroom. The appellant placed one arm around Ms. Hartley's head, held the pistol to her head, and took her upstairs. The appellant then barricaded the bedroom door. Ms. Hartley testified that the appellant said they "both had to die," and he forced her to have drinks and to engage in sexual relations with him. She testified that the appellant "had a gun to me, so I would have done anything." R. 38. Approximately six to eight hours later, Ms. Hartley managed to escape by jumping from a second story window. The appellant threw his pistol out and followed Ms. Hartley out the window. He was apprehended by a "special unit" of the police department that was present on the scene. The appellant's conduct on this occasion resulted in his conviction for criminal trespass, a misdemeanor offense, as a lesser included offense of the charged kidnapping.
On February 25, 1987, the divorce proceedings which Ms. Hartley had instituted against the appellant became final. However, the appellant continued to try to locate and contact his former wife. He drove by her parents' house, parked in front of the residence, telephoned Ms. Hartley at work, and called members of her family to find out her new address. Some of the telephone conversations were tape-recorded. During two conversations with Ms. Hartley, the appellant repeatedly demanded that she have the charges against him (apparently those which resulted in his convictions for burglary and criminal trespass) dropped, and that she return the engagement ring he had given her. In one conversation, he said, "pay-back time, bitch," and he threatened to "get" Ms. Hartley. In another conversation, at the end of December 1987, the appellant told Ms. Hartley that he had learned her new address on Longleaf Circle and that he was going to "blow up the house and everybody in it."
Kathy Green, Ms. Hartley's sister, testified that the appellant called her several times between November 1987 and January 1988, seeking Ms. Hartley's address. The appellant said he wanted Ms. Hartley to return his engagement ring to him. He told Ms. Green that he "felt like walking into the U-Haul [where Ms. Hartley worked], and blowing the s.o.b.'s head off and not thinking twice about it." R. 90.
The transcripts of three recorded telephone conversations between the appellant and Debbie Hall, Ms. Hartley's aunt, during the latter part of December 1987, or the early part of January 1988, were admitted at trial. The first conversation reveals the following:
 "[Ms. Hall]: Ya'll [the appellant and Ms. Hartley] . . . started out on the wrong foot to begin with. You never should have lied to her to begin with. . . .
 "Mr. Minshew: Yeah. I was wrong. I never said I wasn't. I served a year in jail, lost two good jobs over this. You know, when's enough. When is enough, Debbie? Huh?
"[Ms. Hall]: I don't know.
 "Mr. Minshew: When's it enough? When somebody gets killed? Huh?
 "[Ms. Hall]: Nobody wants to harass you. Nobody wants to be harassed.
 "Mr. Minshew: You know that if I go back to jail do you know that my family's crazy, that my family's lost their mind over this shit? Do you think it's gonna end there? That's just the beginning of trouble. I don't want that. I don't want none of my family going to jail for doing something stupid.
 "[Ms. Hall]: I know it. Nobody does . . . nobody . . . our family doesn't either.
 "Mr. Minshew: My family says . . . I'm not gonna say who, but in my family they said if I go back to jail, they'll pay to have Karen killed. And you know something? I believe 'em now. I believe that and I'm scared about that and I've told 'em no." R. 305-06.
In the second tape-recorded conversation that the appellant had with Ms. Hall during the same time period, the following occurred: *Page 706 
 "[Ms. Hall]: . . . Leave [Karen] and leave us alone.
 "Mr. Minshew: No, I'm not leaving you alone now. Now you fucked up. Now I'm pissed. And when I get pissed, I don't give a goddamn. I gotta go back to jail. I'm gonna give you a goddamn reason to go back to jail this time, Debbie. You, Cindy [another of Ms. Hartley's aunts], your goddamn witch mother . . ., and Karen have had it. Now by God if you don't believe that this time, I'm not too goddamn far from your house. I hope you goddamn look out the window all night cause eventually [be]fore Christmas, somebody's gonna pay. Somebody's gonna pay for the shit you've put me and my goddamn family through. You and that goddamn lying ass Karen — you're gonna pay. . . . You're all going to hell cause you're gonna die, motherfuckers, you just wait and see." R. 310-11.
In the third recorded conversation with Ms. Hall, the appellant demanded that Ms. Hall tell Ms. Hartley to drop the charges against him.
 "Mr. Minshew: Just have this shit dropped and over with and I'll go home tomorrow. I wanta go home. I wanta spend Christmas with my family and my girlfriend up home. That's all I wanta do. I don't wanta stay down here. I hate this place.
"[Ms. Hall]: Okay, then stay away.
 "Mr. Minshew: Drop the shit. If it's not dropped . . . I'll call my lawyer by 5:00 o'clock. You have her D.A. get in touch with my lawyer tomorrow and I'll get in touch with him. If it's not dropped there'll be hell to pay and this time I'm not playing. I don't have a goddamn thing to lose if y'all don't drop it, and I'm serious. I've had it.
"[Ms. Hall]: I know you're serious.
 "Mr. Minshew: I'm damn dead serious. . . ." R. 315.
During this time, the police had been notified "off and on." Ms. Hartley was taken into police protective custody on January 19, 1988. The police removed her from her residence and began searching for the appellant.
On January 20, 1988, approximately one week before the appellant was scheduled to be tried for burglary, the appellant telephoned Ms. Hartley, and the following conversation took place.
 "Mr. Minshew: Didn't do nothing [apparently referring to the pending charges]?
"Karen: I couldn't get anything done.
"Mr. Minshew: Couldn't?
"Karen: I tried. Did you call the D.A.?
"Mr. Minshew: Un huh, called my lawyer.
"Karen: Did you?
 "Mr. Minshew: He said you was trying to put more charges on me.
"Karen: No, not hardly.
 "Mr. Minshew: Look, Karen, I figured it out . . . only thing . . . you don't want me to go home; you don't wanta be a good girlfriend; you don't wanta quit wearing my ring, so we're gonna have to be together.
"Karen: Oh, you think so.
 "Mr. Minshew: Yeah, and . . . I can just send you a whole bunch of numbers, a whole bunch of girls that I was dating. I called all of 'em and told 'em. I said, 'Look, she won't let me be with none of y'all so I guess she wants me to be with her. . . .'
 "Karen: Yeah? . . . . [W]ell, look, I did what I could do so I don't have anything to say.
"Mr. Minshew: We'll be back together soon.
"Karen: No, I don't think so.
"Mr. Minshew: Oh, yeah, I promise.
 "Karen: You cannot make somebody be with you that doesn't wanta be with you . . .
"Mr. Minshew: Oh, you must.
"Karen: Okay?
 "Mr. Minshew: You must. Send my ring back then. Alright, Karen, we'll be together. I promise you that. That's what you want? If you won't let me . . . go back to my girlfriend and you want me to be with you, that's what you want, *Page 707 
that's what you're gon[na] get. Me and you. Together again.
"Karen: Well, no, me and you . . .
 "Mr. Minshew: You wear my ring. Go ahead and wear my ring while you date that son-of-a-bitch.
 "Karen: Look, I don't know what you're talking about. I'm trying to drop the charges on you. Okay? That's what you need to be worried about to begin with.
 "Mr. Minshew: I'm not worried about the charges. I'm worried about the ring. The charges ain't nothing anyway. There ain't nothing to it.
 "Karen: (unintelligible). . . . Well, do you want the charges dropped or not?
"Mr. Minshew: I want my ring.
 "Karen: Oh. Okay, well, I'll see what I can do about that. Okay?
 "Mr. Minshew: No, don't see. You put the son-of-a-bitch in the mail in the morning. You're not gon[na] do nothing, Karen, to help nobody. You just wanta fuck around with me.
"Karen: Well, you're not gonna do anything either.
 "Mr. Minshew: Un huh. We're gon[na] be back together. I promise you. I promise you. I don't make promises I don't keep. You know me. Be me and you. Then you can tell me all about it face to face.
"Karen: Face to face, huh? (unintelligible)
(Tape off)" (R. 296-98).
In an effort to locate the appellant, on the evening of January 21, 1988, a police "emergency response team" accompanied Jim Henderson, Ms. Hartley's stepfather, to the Henderson residence on Longleaf Circle. The police were in plain clothes and were disguised as a "family unit." Mobile police sergeant James E. Mayo, Sr., testified that these officers were in "[c]ivilian clothes. Everything was strictly undercover. It had the appearance of just a family [coming home]." R. 123. Sergeant Mayo stated, "We were going to install our people inside the house as the family unit and wait for [the appellant] to come to that residence, but he was already there." R. 131. Ms. Hartley was in police custody one block away. The officers were attempting to unlock the door to the house when Mr. Henderson saw the appellant coming from behind a pickup truck in the driveway. The police officers shouted "Halt." When the appellant threw his hands into the air, a .357 Magnum derringer fell from one of his hands. That derringer was discovered to be loaded with two .38 caliber bullets. The appellant was arrested for the attempted murder of Ms. Hartley, and a search of his person also revealed a tear gas gun in his coat. A survival knife and a pair of binoculars were also discovered.
There was evidence that the appellant had lain in wait for Ms. Hartley. State's witness Wilfred Brinkley testified that on the morning of January 21, 1988, he drove the appellant to a residential area in west Mobile. At the appellant's request, Brinkley let the appellant out on Longleaf Circle at 9:30 a.m. One side of the circle had houses and the other side was wooded. Brinkley last saw the appellant walking towards the woods with a sleeping bag or duffel bag, a diver's-type knife, some beef jerky and fruit juices. The appellant did not give Brinkley any reason for his actions. There was evidence that the appellant had been lying in the grass in an area beside the swimming pool located on the Henderson property. There was also evidence that the appellant was dressed in a manner so as to have been able to withstand the cold temperature for a period of time.
Brinkley also testified that sometime between November 1987 and January 1988, the appellant asked him if he knew anyone who would "beat somebody up" for $1,000. The appellant said he wanted a woman named Jane Childress, who worked at U-Haul, to be "slap[ped] . . . around and beat . . . up a little bit." R. 163-64. Brinkley told the appellant that he was not interested, but that for $1,000 the appellant would have no trouble finding someone else who was.
The appellant testified that he had no intent to kill Karen Hartley on January 21. He stated that he went into the woods near *Page 708 
the Henderson residence that day to "watch their house" and to retrieve the engagement ring he had given Ms. Hartley. He testified that he had borrowed $4,500 from his aunt to buy the ring and that he had not paid his aunt back, so he "wanted to get the ring to send to [his aunt]." R. 191.
The appellant specifically denied telling Ms. Hartley's sister that he "felt like walking into the U-Haul [where Ms. Hartley worked], and blowing the s.o.b.'s head off and not thinking twice about it." He admitted making other intimidating statements to Ms. Hartley's aunts. He acknowledged that some of his comments to members of Ms. Hartley's family "could have been taken as threat[s]" (R. 206), but he maintained that the comments were only "smoke," or "idle threats." He insisted that his intent in going to the Henderson residence on January 21 was to "get the ring," and not to kill Ms. Hartley. R. 216.
 A. The Intent
The question of intent in an attempt case "belong[s] exclusively to the jury to decide." United States v. Quincy, 31 U.S. (6 Pet.) 445, 466, 8 L.Ed. 458 (1832). "Evidence of the defendant's previous threats to kill his wife [are] admissible to show the intent with which the defendant acted in [attempting to] shoot her." Chaney v. State, 417 So.2d at 627. Intent may be inferred from the circumstances attendant to the commission of the crime. Brown v. State, 142 Ala. 287, 294,38 So. 268, 269 (1904). "While proof of the intent to murder is an element of the burden of proof resting on the state, this intent is not susceptible of positive proof, but rests in inference to be drawn by the jury from all the evidence in the case." Williams v. State, 13 Ala. App. 133, 137, 69 So. 376, 377
(1915).
We hold that the jury had before it sufficient, though disputed, evidence of the appellant's intent to kill. The appellant was armed with a loaded firearm at the time of his apprehension. More significant are his prior threats to Ms. Hartley and those he made in the telephone conversations with Ms. Hartley's sister and her aunts.
The appellant repeatedly told Ms. Hartley that it was "pay-back time." R. 41. He told her that he was going to "get [her] and that he did not have anything to lose," R. 43. On one occasion, he told her that they "both had to die." R. 38. On another occasion he told her that he had discovered her new address and that "he would go to the house and blow up the house and everybody in it." R. 45.
The appellant told Kathy Green, Ms. Hartley's sister, that he "felt like walking into the U-Haul [where Ms. Hartley worked], and blowing the s.o.b.'s head off and not thinking twice about it." R. 90.
The appellant told Debbie Hall, Ms. Hartley's aunt, that he "had nothing to lose," that "some would pay" if he went to jail." R. 63, 65. The appellant asked Ms. Hall, "When's it enough? When somebody gets killed?" R. 305. He also told her that a member of his family said, "[I]f I go back to jail, they'll pay to have Karen killed. . . . I believe that and I'm scared about that and I've told 'em no." R. 306. The appellant told Ms. Hall, "If [the criminal charges are] not dropped there'll be hell to pay and this time I'm not playing. I don't have a goddamn thing to lose if y'all don't drop it, and I'm serious. I've had it. . . . I'm damn dead serious." R. 315. The appellant also told her, "I gotta go back to jail. I'm gonna give you a goddamn reason to go back to jail this time, Debbie. You, Cindy, your goddamn witch mother . . ., and Karen have had it. Somebody is gonna pay for the shit you've put me and my goddamn family through. You, and that goddamn lying ass Karen — you're gonna pay." R. 310-11. In that same telephone conversation, the appellant also stated, "You're all going to hell cause you're gonna die, motherfuckers, you just wait and see." R. 311.
The appellant told Cindy Tanner, Ms. Hartley's aunt, "You and that blond headed bitch will pay. . . . and I will catch you son-of-a-bitches out." R. 309.
 B. The Overt Act
We also hold that the appellant's conduct — arming himself with a loaded firearm, lying in wait at the place he expected *Page 709 
Ms. Hartley to arrive, and approaching the undercover "family unit" as they were about to enter the residence — amounted to an overt act in execution of his intent to kill his ex-wife. While the appellant's conduct falls within the area between conduct that clearly constitutes mere preparation and that which constitutes an obvious attempt, we find that the State presented a prima facie case of attempted murder.
"Frequently the question arises whether the evidence shows that the criminal design proceeded far enough towards execution to be within the punitive provisions of the law [of attempt].Lewis v. State, 35 Ala. 380, 12 Cyc. 177." Johnson v. State,1 Ala. App. 102, 106, 55 So. 321, 323 (1911). Although the overt act required for an attempt "need not be the last proximate act prior to the commission of the crime itself," People v.Parrish, 87 Cal.App.2d 853, 855, 197 P.2d 804, 806 (1948), it must proceed beyond mere preparation, McDowell v. State,19 Ala. App. 532, 533, 98 So. 701, 701-02 (1924). "Preparation alone is not sufficient. Something more is required than mere menace, preparation, or planning." Whiddon v. State,53 Ala. App. 280, 283, 299 So.2d 326, 329-30 (1973) (quotingGroneau v. State, 201 So.2d 599, 603 (Fla.App.), cert. denied,207 So.2d 452 (Fla. 1967), quoted with approval in Thornton v.State, 570 So.2d 762, 768 (Ala.Cr.App. 1990).
"An 'overt act,' as an element in an attempt to commit a crime, must be something done that 'directly moves towards the crime, and brings the accused nearer to its commission than mere acts of preparation of or planning.' " Whiddon v. State,53 Ala. App. at 284, 299 So.2d at 330, (quoting State v.Thomason, 23 Okla. Cr. 104, 212 P. 1026, 1027 (1923)), quoted inThornton v. State, 570 So.2d at 768. "[R]emote preparatory acts not reasonably in the chain of causation do not make out a case of attempt." Huggins v. State, 41 Ala. App. 548, 550,142 So.2d 915, 917, cert. denied, 273 Ala. 708, 142 So.2d 918 (1962).
"Much ink has been spilt in an attempt to arrive at a satisfactory standard for telling where preparation ends and attempt begins." Mims v. United States, 375 F.2d 135, 148 (5th Cir. 1967). "Both as fascinating and as fruitless as the alchemists' quest for the philosopher's stone has been the search, by judges and writers, for a valid, single statement of doctrine to express when, under the law of guilt, preparation to commit a crime becomes a criminal attempt thereat." Strahorn, Preparation for Crime as a Criminal Attempt, 1 Wn. Lee L.Rev. 1, 1 (1939).
Various tests have been proposed for determining what conduct constitutes the necessary overt act sufficient for an attempt. See generally Ala. Code 1975, § 13A-4-2 (Commentary at 84); Annot., 54 A.L.R.3d 612 (1973); 2 W. LaFave A. Scott,Substantive Criminal Law, § 6.2(d) (1986); Skilton, TheRequisite Act in a Criminal Attempt, 3 U.Pitt.L.Rev. 308 (1937).
The federal courts use the Model Penal Code "substantial step" test in defining an overt act. Under this test, the "defendant must have engaged in conduct which constitutes a substantial step toward commission of the crime. A substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent." United States v. Mandujano,499 F.2d 370, 376 (5th Cir. 1974), cert. denied, 419 U.S. 1114,95 S.Ct. 792, 42 L.Ed.2d 812 (1975). See also Wechsler, Jones, Korn, The Treatment of Inchoate Crimes in the Model PenalCode of the American Law Institute: Attempt, Solicitation Conspiracy, 61 Colum.L.Rev. 571 (1961).
In Alabama and other jurisdictions, the standard for the necessary overt act has been variously phrased as a "direct ineffective act done towards [the] commission [of the crime],"Broadhead v. State, 24 Ala. App. at 578, 139 So. at 117; DeGraafv. State, 34 Ala. App. 137, 142, 37 So.2d 130, 134 (1948); accord State v. Thomason, 23 Okla Cr. at 105, 212 P. at 1027; "some appreciable fragment of the crime . . . in such progress that it would be consummated unless interrupted by circumstances independent of the will of the attempter,"Whiddon v. State, 53 Ala. App. at 284, *Page 710 299 So.2d at 330 (quoting Groneau v. State, 201 So.2d at 603), quoted in Thornton v. State, 570 So.2d at 768; accord People v.Buffum, 40 Cal.2d 709, 713, 256 P.2d 317, 321 (1953); or an "act . . . reach[ing] far enough towards the accomplishment of the direct result to amount to the commencement of the consummation," McDowell v. State, 19 Ala. App. at 533,98 So. at 702; accord People v. Miller, 2 Cal.2d 527, 528, 42 P.2d 308,309 (1935).
Some courts have held that an accused has not performed the necessary overt act as long as his conduct is equivocal, on the theory that "so long as the equivocal quality remains, no one can say with certainty what the intent of the defendant is."People v. Miller, 2 Cal.2d at 529, 42 P.2d at 310. See alsoPeople v. Terrell, 99 Ill.2d 427, 77 Ill.Dec. 88, 93-97,459 N.E.2d 1337, 1342-46 (1984) (Simon, J., dissenting). CitingPeople v. Miller, the appellant argues that because he never aimed at, fired at, or threatened Ms. Hartley with the gun on January 21, 1988, his conduct remained equivocal, and therefore did not constitute a sufficient overt act for attempted murder.
In Miller, the accused marched into the local post office and threatened to kill one Jeans because Jeans "had been annoying [the accused's] wife and the authorities would not take charge of the matter." 2 Cal.2d at 530, 42 P.2d at 309. Later that afternoon, the accused, armed with a rifle, went to a field where both Jeans and the local constable were working. The accused approached the constable, stopped to load his rifle, and Jeans ran away. The accused continued towards the constable and surrendered his rifle without resistance. The California Supreme Court reversed the attempted murder conviction because it found the accused's actions too equivocal to constitute an overt act in partial execution of an intent to kill Jeans.
In People v. Terrell, two men armed with guns were found hiding behind a service station. One of the men also had a black nylon stocking in his pocket. The Illinois Supreme Court affirmed the attempted armed robbery conviction because it found the act of "lying in wait . . . reconnoitering the place contemplated for the commission of the crime . . . [while in] possession of materials to be employed in the commission of the crime" sufficient to constitute a substantial step, or overt act towards the commission of armed robbery. 99 Ill.2d at 431, 77 Ill.Dec. at 93, 459 N.E.2d at 1342. See also United Statesv. Jackson, 560 F.2d 112, 120 (2d Cir.), cert. denied,434 U.S. 941, 98 S.Ct. 434, 54 L.Ed.2d 301 (1977) (wherein the court held that "either type of conduct [reconnoitering or possession of materials to be used in the crime], standing alone, was sufficient as a matter of law to constitute a 'substantial step' if it strongly corroborated [the accused's] criminal purpose"). Three justices dissented in Terrell, arguing that the conduct of the accused was equally consistent with attempted burglary, or some other unspecified offense, as it was with attempted robbery. The majority of the court rejected that argument, and in so doing, gave one of the more cogent reasons for rejecting the "equivocation" test:
 "When defining 'attempt' it becomes problematic deciding when to allow the police to intervene in an unfolding course of criminal conduct. While caution must be exercised to avoid punishment for inconclusive acts, prevention of an intended crime is necessary. The defendants in . . . the case at bar were involved in crimes which posed a serious threat of great bodily harm to the victim. It should not be necessary to subject victims to face to face confrontation with a lethal weapon in order to make a positive finding of the essential element of a substantial step."
People v. Terrell, 99 Ill.2d at 430, 77 Ill.Dec. at 92,459 N.E.2d at 1341 (citation omitted). In the present case, it is apparent that the appellant was bent on the commission of some
dangerous crime, which from his prior threats, the jury was authorized to find was the murder of Ms. Hartley. The law of criminal attempt did not require law enforcement personnel to refrain from intervening until the appellant actually had his intended victim in his gun sights. See United States v.Stallworth, *Page 711 543 F.2d 1038, 1041 (2d Cir. 1976) (recognizing the "importance of a rule encouraging early police intervention where a suspect is clearly bent on the commission of [a dangerous] crime").
The "equivocation" test of People v. Miller has been criticized. See People v. Jiminez, 228 Cal.App.3d 581, 583-84, 279 Cal.Rptr. 157, 159-60, review granted, 282 Cal.Rptr. 125,811 P.2d 11 (Cal. 1991); Note, Crime Prevention and JudicialCasuistry, 5 Hastings L.J. 169, 170-74 (1954). We do not believe it states the law in Alabama. Although James v. State,468 So.2d 887 (Ala.Cr.App.), reversed, Ex parte James,468 So.2d 889 (Ala. 1984), might be read as an "equivocation" case, the result is better explained on the basis of the defense of renunciation found in Ala. Code 1975, § 13A-4-2(c).
In James, the accused walked into a grocery store, approached the assistant manager, and stated, "See that black guy over there at the register . . . well, he has got a gun and do as he says and not start no shit." 468 So.2d at 888. The accused "stood around for a minute and then left the store." Id. His companion did the same. The issue was whether the conduct of the accused amounted to an overt act towards the commission of robbery, defined to include a threat of violence during the course of an attempted theft. This Court held the accused's conduct sufficient for an attempted robbery.
The Alabama Supreme Court reversed. Finding that there was no overt act in furtherance of an attempted theft, the Court held:
 "[The] [d]efendant's statement, made under the instant circumstances, is not reasonably susceptible of an inference that [d]efendant or his companion committed an attempted theft. . . . [I]t appears that no property was touched, that the defendant did not attempt to touch any, and that defendant did not ask for, or even remotely allude to, any property. While the evidence is sufficient to establish the element of threat, it is insufficient to establish that [d]efendant's words or actions were directed toward obtaining or exerting unauthorized control of any property.[3]
Ex parte James, 468 So.2d at 891.
Although the Alabama Supreme Court mentioned neither "equivocation" nor "renunciation" in Ex parte James, the result may be interpreted on the basis of the defense of renunciation, as set out in § 13A-4-2(c), rather than on the equivocal nature of the accused's acts. Section 13A-4-2(c) provides in pertinent part:
 "A person is not liable [for attempt] if, under circumstances manifesting a voluntary and complete renunciation of this criminal intent, he avoided the commission of the offense attempted by abandoning his criminal effort and, if mere abandonment is insufficient to accomplish such avoidance, by taking further and affirmative steps which prevented the commission thereof."
Ex parte Turner, 3 Okla. Cr. 168, 104 P. 1071 (1909), is another frequently cited attempt case which was reversed for insufficient evidence of an overt act. That case may also be better understood as a "renunciation" case. In Turner, the accused landlord had a rent dispute with his blacksmith-tenant and threatened to close the blacksmith shop. Later, the landlord returned to the shop with a rifle in his hand. Finding the shop already closed, the landlord handed the rifle to his son and told the boy to take the weapon home. The Oklahoma Court of Criminal Appeals found the evidence of attempted murder insufficient. It held:
 "A party may purchase and load a gun, with the declared intent to shoot his neighbor; but until some movement is made to use the weapon upon the person of his intended victim there is only preparation and not an attempt. . . .
 "Whatever may have been petitioner's intention, there is no testimony showing any overt act in an attempt to kill or injure." *Page 712 
Ex parte Turner, 3 Okla. Cr. at 171, 104 P. at 1074. Since 1909 when Turner was decided, many modern codes have provided for a renunciation defense similar to § 13A-4-2(c), see 2 W. Lafave 
A. Scott, Substantive Criminal Law § 6.3 at 54 (1986). Some of the older cases may be explained on the basis that "courts are sometimes influenced by the fact of voluntary withdrawal to the extent that they characterize the defendant's prior acts as mere preparation upon facts that would certainly justify a contrary conclusion." Id. at 52.
In the present case, of course, there was no withdrawal, voluntary or otherwise. The appellant was apprehended before he could bring his intent to fruition. It is possible that the appellant may have intended only to retake a ring from Ms. Hartley by force or by putting her in fear and that he did not intend to kill her. However, he made no prior threats to retake the ring. He did make prior threats to kill her. The jury was therefore warranted in drawing the conclusion that his intent was to kill, and by lying in wait, armed, at her residence, he had performed an overt act towards the effectuation of that intent.
We find the following hypothetical from a recognized expert on criminal law particularly instructive in this case:
"[P]reparation is not an act toward commission.
 "An illustration may be helpful. D has a grudge against X and decides to murder him. D considers possible methods of perpetration and settles upon shooting. With this in mind he steals a pistol and ammunition, and loads the pistol with some of the ammunition. He prepares a home-made shoulder holster so the weapon can be carried without being seen or causing telltale bulges in his clothing. He puts on the holster, with the pistol, so he will be used to it. He makes inquiries to determine just where X lives, where he works, when he quits work and how he goes home. He learns that X quits work at five in the afternoon, takes a certain bus at a nearby station, leaves the bus at its nearest stop to his home, which is about two blocks away, crosses the street to be on the same side as his house, and walks the remaining distance. He studies that side of the street and finds a thick clump of bushes by the side of the walk and near X's house. As it is mid-winter he knows it will be dark when X reaches that spot. He studies the street lights and finds that they will give enough light for his purpose without interfering with his concealment. He decides to hide there that night and shoot X as he goes by. But as it is noon when this decision is made, D goes home to wait until the proper time. He has been indiscreet in his inquiries and is arrested at his home on a charge of attempting to murder X. He is not guilty of such an attempt. All of these elaborate arrangements were matters of preparation.
 "Suppose, however, he was not arrested at that time. Towards evening D went to the neighborhood of X's house. He knew about the time X would arrive on the bus and was near his intended place of ambush at that time. He saw the bus stop, directly under a bright light, and saw X as he left the bus and started to walk. D then concealed himself in the bushes. As X came in range D drew his pistol. He took aim to the best of his ability, waited until X was at the closest point, and then pulled the trigger. But his aim was faulty and X was not touched although the bullet went by within inches of his head. D's guilt of an attempt to murder X under these facts is too clear for question.
 "The problem is to determine at what point his acts went beyond preparation and were in the nature of perpetration. The actual firing of the shot was not essential to the attempt. There should be no doubt that D was guilty of the attempt when he took aim at his intended victim who was then in range, — or even when he drew the weapon. In fact, the cases seem to make clear that D was guilty of attempt when he took his stand in the bushes. Although X was over a block away, and probably out of *Page 713 range of the pistol, this act was a step in the direction of perpetration."
Perkins, Criminal Attempt and Related Problems, 2 U.C.L.A.L.Rev. 319, 325-26 (1954) (emphasis added) (footnote omitted). See also Ford v. State, 218 So.2d 731 (Miss. 1969), wherein the court held that defendants' arming themselves and going to the place where they expected to find the victim was a sufficient overt act for attempted murder. See also Stokes v.State, 92 Miss. 415, 46 So. 627 (1908), wherein the court found that A's soliciting B to murder the victim, combined with A's handing a loaded gun to B, amounted to attempted murder.
We hold that the appellant's acts went beyond mere preparation and constituted an overt act towards the commission of murder because, after making threats on his ex-wife's life, the appellant armed himself, reconnoitered the place where he expected her to be, and laid in wait for her. To the extent that such conduct was "equivocal" and may have implied an intent other than murder, it presented a question of fact for the jury.
 II.
The trial court properly refused to instruct the jury on the offense of reckless endangerment as a lesser included offense of attempted murder.
"A person commits the crime of reckless endangerment if he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." Ala. Code 1975, § 13A-6-24(a). Under the facts presented here, reckless endangerment was not a lesser included offense of attempted murder because the appellant — under any interpretation of the testimony — did not commit the type of conduct constituting reckless endangerment.
The offense of reckless endangerment embraces such conduct as:
 "[r]eckless driving[,] . . . dangerous conduct with firearms[,] . . . throwing objects at common carriers, dropping objects from toll bridges, placing equipment within six feet of a high voltage wire, shooting at an unoccupied building, shooting at an aircraft, placing an obstruction on railway tracks, tampering with a railroad safety appliance, and throwing substances likely to injury persons on public highways."
A.L.I. Model Penal Code § 211.2 (1980) (footnotes omitted). See also, Turner v. State, 542 So.2d 1314 (Ala.Cr.App. 1989), where this Court held that in a prosecution for attempted murder, the accused was entitled to a charge on reckless endangerment when the evidence was that he, while intoxicated, drove his vehicle into a police car.
In this case, the appellant may have been guilty of "attempted reckless endangerment"; however, the commission of such an offense is legally impossible. There is no such crime as attempted reckless endangerment because the offense of reckless endangerment involves recklessness and an attempt as defined by § 13A-4-2 involves intent. " '[I]ntentional' and 'reckless' are inconsistent terms." Stennet v. State,564 So.2d 95, 96 (Ala.Cr.App. 1990).
 III.
Because attempted murder is a specific intent crime, all of the appellant's collateral criminal acts relating to Karen Hartley and her family were admissible to shed light on the appellant's intent to commit the charged offense. " 'If an accused is charged with a crime that requires a prerequisite intent . . . then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime.' Jones v. State,439 So.2d 1308, 1310 (Ala.Cr.App. 1983)." Minshew v. State, 542 So.2d at 310 (affirming the appellant's burglary conviction over his argument that evidence of the instant offense was inadmissible).
 IV.
The appellant argues that the trial court's initial charge on reasonable doubt could have led the jury to believe that it was authorized to convict on a standard of proof less demanding than beyond a reasonable doubt, in violation of the holding in *Page 714 Cage v. Louisiana, 498 U.S. ___, 111 S.Ct. 328, 112 L.Ed.2d 339
(1990). This issue has not been preserved for review because the appellant did not object to the court's charge on reasonable doubt. See Rule 21.2, A.R.Crim.P.
The charge, moreover, does not suffer from the same infirmities as the instruction in Cage. In that case, the Supreme Court held that a charge defining "reasonable doubt" in terms of the following three phrases implied a degree of proof less than that required by the due process clause: "substantial doubt," "grave uncertainty," and "moral certainty." The question whether a reasonable doubt charge employing one or two of these phrases, in isolation, would violate the dictates of due process was not presented in Cage. We are not confronted in this case with all three phrases in the same context as the charge in Cage. See Ex parte White, 587 So.2d 1236
(Ala. 1991); McGee v. State, 594 So.2d 219 (Ala.Cr.App. 1991);McMillian v. State, 594 So.2d 1253 (Ala.Cr.App. 1991); Earhartv. State, 593 So.2d 119 (Ala.Cr.App. 1991); Williams v. State, [Ms. CR-89-191, June 14, 1991], 1991 WL 119358 (Ala.Cr.App. 1991); Adams v. State, 587 So.2d 1265 (Ala.Cr.App. 1991). See also Gaskins v. McKellar, ___ U.S. ___, 111 S.Ct. 2277,114 L.Ed.2d 728 (1991), wherein Justice Stevens, in a memorandum opinion explaining his reason for voting to deny the writ of certiorari, observed that because a charge did not contain the "improper language" of "grave uncertainty," it did not fall within the rule of Cage).
 V.
The appellant claims that the circuit court erroneously denied his motion for new trial on the ground of perjured testimony.
At trial, Mobile police sergeant James E. Mayo, Sr. testified that when the appellant was arrested for the instant offense, three weapons were found: a .357 Magnum stacked barrel derringer; a flare or tear gas gun; and a "a twelve inch hunting type knife or an air force survival type knife." R. 127. The knife was not offered in evidence. On cross-examination by defense counsel regarding the whereabouts of the knife, Sergeant Mayo testified that the knife had been released with other items of personal property to the appellant's mother. The appellant's mother testified at trial that she never received a knife. On motion for new trial, Sergeant Mayo admitted that "no knife [was] found in this case." R. 269. He stated that he did not recall testifying to the contrary during the trial.
The standard for the granting of a motion for new trial on the ground of perjured testimony is set out in Ex parteFrazier, 562 So.2d 560, 569-70 (Ala. 1989):
 "In order to grant a motion for new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; 3) that the evidence tending to prove the witness's perjury has been discovered since the trial; and 4) that that evidence could not have been discovered before or during trial by the exercise of due diligence."
Even assuming that Sergeant Mayo's trial testimony was knowingly false (a determination we expressly do not make), the appellant was not entitled to a new trial on this ground. The weapon alleged to have been used in the attempted murder was the derringer, not the knife. Furthermore, State's witness Brinkley testified that the appellant had a "diver's-type" knife in his possession when Brinkley took the appellant to the woods near the Henderson residence. We conclude that there is no significant chance that the jury would have reached a different verdict had Sergeant Mayo testified that no knife was found.
 VI.
The appellant claims that the trial court should have granted his motion for new trial on the ground that one of the jurors consulted a dictionary during deliberations. *Page 715 
The record reveals that the following occurred after the jury began deliberating:
 "THE COURT: [Jury foreperson], you can have a seat. They have advised me that one member of this jury, and it may have been you, reported to the bailiff, Mr. Tom Martin, that one of the members of the jury — and it's not important which one — looked up some definitions last night and reduced those definitions to writing and wished to convey to the other members of the jury what definitions he or she had looked up. And it's further my understanding that prior to your allowing [him] or her to do that you asked for instructions from the court. Have I stated everything as it has been stated?
"FOREPERSON: Yes, sir.
 "THE COURT: Excuse me. [W]as everything I stated the way it happened?
FOREPERSON: Yes, sir.
 "THE COURT: Then I must tell you this: If any member of this jury has any legal question whatsoever I can answer it for you. But the Supreme Court of Alabama — before I say the Supreme Court, it may be a Court of Criminal Appeals case — I know specifically says, and more than one, that the jury cannot do any form of, quote, experiments, at home and then come back and relay those to the jury. Now, I really question whether looking up a definition would be, quote, doing any experiment on his own. But the bottom line is, any instructions you get concerning this case should come from the court. Now, to simplify that matter, why don't you as the foreman of this jury ask me any question or any definition, if it be in the form of a legal definition, and I'll be happy to give it to you. Okay. Now, the reason for that is absolutely obvious. . . . The judge is the sole trier of the law of the case and the jury is the absolute sole trier of the facts. However, the jury cannot go outside of those facts. Simply stated, the guilt or innocence of the defendant must be from the evidence that was produced from this stand and any exhibits . . . authorized to be introduced in evidence. . . . [Y]ou can't speculate on what could have happened, could have been, may have been, any of those kind of things. But the jury has a right . . . to draw inferences and conclusions from the facts that you deem appropriate. But they must come from the facts, consistent with the law that [the] [j]udge . . . charged you. Now that I've said all of that, what would you like defined.
 "FOREPERSON: Well, the thing is, one of the jurors decided that — well, I, myself, would not have considered it wrong for a person to fall back on a dictionary due to the lack of his own vocabulary.
 "THE COURT: Quite frankly, I don't know whether there's anything wrong with it either. I'm being super cautious.
 "FOREPERSON: And I really don't know the words that the juror looked up. He informed me that he had done it and raised the question, should he tell the rest. And I said, let's get a ruling on it.
 "THE COURT: I think you did the right thing. But again, I say I'm being super cautious. I don't know whether there's anything wrong with it or not either. I don't know whether looking up some word in the dictionary would be considered any, quote, outside activity and/or experiment. To be absolutely and totally safe just ask me and I'll answer it.
 "FOREPERSON: I'll tell you, there were some questions that came up. Could you expound more on — I know it has been done many times before, but could you expound more on the reasonable doubt and moral certainty?
 "THE COURT: Certainly. [The court then recharged the jury on the meaning of reasonable doubt.] Does that answer it?
"FOREPERSON: That answers it.
"THE COURT: . . . What other definitions?
 "FOREPERSON: Any other definitions? Okay. I guess that covers it, judge. I appreciate your time.
 "THE COURT: You did the right thing. "(Jury not present.) *Page 716 
 "THE COURT: You want to make some exceptions, [defense counsel]?
 "[DEFENSE COUNSEL]: Yes, sir. . . . [B]ased on [the fact that one of the jurors looked up the definition], Mr. Minshew has asked me to ask this court for a mistrial.
"THE COURT: Denied." R. 247-53.
"Juror misconduct will justify a new trial when it indicates bias or corruption, or when the misconduct affected the verdict, or when from the extraneous facts prejudice may be presumed as a matter of law." Whitten v. Allstate Ins. Co.,447 So.2d 655, 658 (Ala. 1984). As a general rule, "[w]here extraneous material [is] introduced into the jury's deliberations, . . . actual prejudice [must] be shown to work a reversal of the verdict." Nichols v. Seaboard Coastline Ry.,341 So.2d 671, 672 (Ala. 1976). However, in some cases, "the character and nature of the extraneous material . . . constitutes prejudice as a matter of law and no showing that the jury was in fact influenced thereby in arriving at their verdict is necessary." Id. (prejudice presumed as a matter of law from jury's consulting encyclopedia and dictionary definitions of "negligence," "contributory negligence," "subsequent negligence," and "subsequent contributory negligence").
In Hallmark v. Allison, 451 So.2d 270 (Ala. 1984), prejudice was presumed from a juror's taking measurements of a pickup truck. However, in Dulaney v. Burns, 218 Ala. 493, 119 So. 21
(1928), overruled on related grounds, Whitten v. Allstate Ins.Co., 447 So.2d at 659, involving a will contest case, prejudice was not presumed or found to have been proved where the jury read and considered the definitions of the words "undue," "influence," and "confidential." Our supreme court later citedDulaney for the proposition that "dictionary definitions of common words, commonly understood, d[o] not in fact constitute extraneous matters." Nichols, 341 So.2d at 674. This Court followed that assessment of the law in Davenport v. State,426 So.2d 473 (Ala.Cr.App. 1982) (after remand from Alabama Supreme Court), when we determined, in effect, that the dictionary definition of the word "rape" was not "extraneous": "[T]he meaning of rape of a female by a male . . . is so clear and unambiguous that no person intelligent enough to be a juror could err as to the meaning." Davenport, 426 So.2d at 476.
In Nowogorski v. Ford Motor Co., 579 So.2d 586 (Ala. 1990), the jury read and discussed the dictionary definition of the word "defective" during deliberations. The Alabama Supreme Court held that the plaintiff was entitled to a new trial because at least one juror testified that his decision in the case was influenced by the definition. 579 So.2d at 590.
In the present case, not only did no juror state that his decision was influenced by a dictionary definition, but the trial judge expressly instructed each juror, before the verdict, to disregard any definitions unless they were given by the court. No prejudice was shown. Under the criteria established in Nichols, Dulaney, and Nowogorski, the appellant was not entitled to a new trial on this ground of jury misconduct.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] "Hartley" was the name of the appellant's ex-wife at the time of the trial for the instant offense. Prior to her marriage to the appellant, she was Karen Childress. Instead of designating her by the names "Childress," "Minshew," or "Hartley," depending upon her marital status at times relevant to this appeal, we shall refer to her as "Hartley" throughout.
[3] This is not to say, of course, that the evidence is insufficient to establish crimes other than robbery. See, e.g., § 13A-6-23 (menacing) and § 13A-11-8 (harassment)."