The appellant, Leon Perry, was indicted for the intentional murder of Harold Watkins, Jr. A jury convicted him of the charged offense and he was sentenced as a habitual felony offender to 30 years' imprisonment. Three issues are raised in this direct appeal from that conviction.
 I
The appellant contends that the evidence was insufficient to support his conviction because, he says, the State failed to prove that he had the requisite intent to kill Watkins.
The State's evidence tended to show that, on the morning of December 27, 1991, Larry McGee, Ledford Bolar, and Harold Watkins, Jr., were visiting Dorothy Hall at her residence in Brighton, Alabama. At some point, the appellant knocked on Ms. Hall's front door. Ms. Hall testified that either Bolar or Watkins jokingly told the appellant that he was not wanted there. Bolar testified that Watkins said, "There goes Leon. We don't want his mouth." R. 57.
The appellant continued to knock on the door and, after a short period of time, someone let him in. Ms. Hall testified that the appellant "came in in a rage" and complained to Bolar and Watkins "about playing with [him] so much," but she did not hear the appellant make any threats. R. 39, 45. McGee stated that once the appellant was inside the house, he began cursing Bolar and Watkins and told the two men that he was going to kill them. R. 25-26, 33. According to Bolar, the following occurred once the appellant entered Ms. Hall's residence:
 "[The appellant] said, 'Why didn't you let me in?' Harold Watkins said, 'We don't *Page 73 
want to hear your mouth.' [The appellant] said, 'This is not your house.' Harold said, 'This is not your house.' [The appellant] said, 'I don't want this child to be playing with me.' Dorothy Hall hollered, 'Cut that out.' That was the end of that." R. 57.
The appellant remained in Ms. Hall's residence a short time, then left in the truck in which he had arrived. Bolar stated that after the appellant left, he and Watkins went out on the porch to talk. Within five to ten minutes, the appellant returned. Bolar testified that the appellant "hopped out of the truck with his rifle," then "[a]imed it in the air and shot it." R. 59-60. He stated that the appellant then came through the gate at the edge of the yard and "started talking. [The appellant] said, 'Who is doing all of the talking now?' He said, 'Who is the baddest?' " R. 59. Bolar said that the appellant then "aimed [the rifle] at Harold Watkins and shot him." R. 60. When asked if Watkins had "any kind of weapon on him," and if he saw Watkins "pull any kind of weapon," Bolar responded, "No." R. 62. After shooting Watkins, the appellant left the scene in his truck.
Although neither McGee nor Ms. Hall witnessed the shooting, both testified that they saw the appellant return, that he had a rifle or a shotgun at that time, and that they heard two shots fired. McGee also testified that after he heard the first shot, he heard the appellant say, "You bad, you bad now, you bad now," then he heard the second shot. R. 28.
Sergeant James Duke of the Jefferson County Sheriff's Department investigated the shooting. He testified that while he was at the scene, he received a radio message that the appellant wanted to turn himself in. Sergeant Duke stated that he then went to the address given to him, which was the residence of the appellant's mother-in-law, and spoke with the appellant. Duke testified that when he asked the appellant where the rifle was, the appellant replied that it was in the truck. The appellant then accompanied Duke to a truck parked in front of the residence, where Duke found a Winchester .30-30 rifle that had been recently fired. Duke acknowledged on cross-examination that when he first arrived at the appellant's mother-in-law's residence, the appellant let him in, saying, "I did it. I did it, but I didn't mean to." R. 95.
The appellant testified in his own behalf and admitted that a shot from his rifle killed Watkins, but he denied that he had any intention either to shoot or to kill Watkins. His defense appears to have been a mixture of self-defense and accident.[1]
The appellant testified that he had had trouble with Watkins and Bolar during the six months prior to the shooting because "[t]hey would sit in front of [his] mother's house and sell drugs" and he would have to "run them away." R. 139. He stated that while he was in Ms. Hall's residence on the morning of the shooting, Watkins and Bolar were "picking at [him]," saying "We are going to get you, we are going to mess you up." R. 145. The appellant said that when he left Ms. Hall's residence, he went to his brother's house for a short time, then started home. He then remembered that he was supposed to haul some coal for Ms. Hall, so he went back to her house.
The appellant gave the following version of the shooting: Watkins and Bolar were inside Ms. Hall's house when the appellant returned. As the appellant got out of his truck, Watkins and Bolar "r[a]n out [onto the sidewalk] like they were coming at [him]." R. 147. The appellant "grabbed [his] rifle," which he kept "[o]n the back of the seat on the top part in the window" of his truck and fired into the air. R. 147, 144. Watkins and Bolar said, "We are going to mess you up." R. 148. Watkins "had one hand reaching in his pocket like he was going to get his gun." R. 150. The appellant then cocked his rifle "and was bringing it back up to shoot in the air, and as [he] brought it back to shoot into the air, it went off." Id. When the appellant realized that he had shot Watkins, he panicked and left. *Page 74 
Intentional murder is defined as intentionally causing the death of another person. Ala. Code 1975, § 13A-6-2(a)(1). It is undisputed that the appellant caused the death of Harold Watkins. The only question remaining is whether there was sufficient evidence from which the jury could have concluded that the appellant intended to cause Watkins' death.
The appellant complains in his brief that "[t]he State did not present any direct evidence at trial which could have established the element of intent to murder." Appellant's brief at 10. However, as the appellate courts of this state have repeatedly observed:
 "Intent, 'being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.' Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908); Hamilton v. State, 283 Ala. 540, 219 So.2d 369, cert. denied, 396 U.S. 868, 90 S.Ct. 134, 24 L.Ed.2d 121 (1969)."
Cook v. State, 409 So.2d 965, 968 (Ala.Cr.App. 1981). The Alabama appellate courts have also repeatedly held that intent to kill may be inferred from an accused's use of a deadly weapon. E.g., Sparks v. State, 261 Ala. 2, 4, 75 So.2d 103, 105
(1953); Barnes v. State, 571 So.2d 372, 374 (Ala.Cr.App. 1990);Benton v. State, 536 So.2d 162, 164 (Ala.Cr.App. 1988);Breeding v. State, 523 So.2d 496, 500 (Ala.Cr.App. 1987).
In the present case, the State's evidence that the appellant left Ms. Hall's residence after a verbal altercation with Watkins, that he returned a short time later armed with a rifle, and that he was aiming at Watkins when he fired the fatal shot was sufficient evidence from which the jury could reasonably infer that the appellant intended to kill Watkins. See Crews v. State, 616 So.2d 392, 393-94
(Ala.Cr.App. 1993) (testimony of three witnesses "that they had seen [defendant] with [a] shotgun on the day of the shooting" and testimony of eyewitness "that he saw [defendant] point the gun at [the victim] and shoot her in the abdomen" sufficient to support conviction for intentional murder). The somewhat conflicting testimony of the State's witnesses and the appellant's claims of self-defense and accident simply created questions of fact for the jury to resolve. See, e.g., Brown v.State, 588 So.2d 551, 559 (Ala.Cr.App. 1991) ("the resolution of conflicting testimony [is] for the jury's determination");Waddle v. State, 473 So.2d 580, 582 (Ala.Cr.App. 1985) ("where there is a conflict in the evidence, the inferences to be drawn from the evidence, the weight of the evidence, and the credibility of the witnesses are all questions for the jury");Quinlivan v. State, 627 So.2d 1082, 1087 (Ala.Cr.App. 1992) ("[t]he issue of self-defense invariably presents a question for the jury"); Maddox v. State, 370 So.2d 1111, 1114
(Ala.Cr.App. 1979) ("[i]n a prosecution for murder it is for the jury to determine the claim of the accused that the shooting was accidental"), cert. denied, 370 So.2d 1115 (Ala. 1979).
 II
At trial, the State introduced seven photographs of the victim that had been taken after the shooting. One of the photographs was taken at the scene; the other six were taken at the pathologist's direction during the autopsy. The appellant argues that the trial court erred in admitting the photograph taken at the scene (State's Exhibit 3) and two of the photographs taken during the autopsy (State's Exhibits 8 and 11). He asserts that these photographs "did not shed any light on the issues being tried," that they "had no probative value," and that they "were calculated to prejudice [him] in the eyes of the jury." Appellant's brief at 12.
 "Photographs are admissible if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered. Baldwin v. State, 282 Ala. 653, 213 So.2d 819 (1968). The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, [494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986)]." *Page 75 
Ex parte Bankhead, 585 So.2d 112, 118 (Ala. 1991). See also C. Gamble, McElroy's Alabama Evidence § 207.01(2) (4th ed. 1991). "In addition, photographic exhibits are admissible even though they may be cumulative [or] demonstrative of undisputed facts."Hopkins v. State, 429 So.2d 1146, 1157 (Ala.Cr.App. 1983).
 A
State's Exhibit 3 depicts the victim on the porch of the residence where he was shot. A portion of a couch appears in the background; the victim's head and shoulders are between the couch and the porch railing; brain matter is protruding from the side of the victim's head; and there is blood on the porch railing and wall. This photograph was introduced during the testimony of Ledford Bolar, the only eyewitness to the shooting. Bolar testified that, after the appellant shot the victim, the victim "brushed against" him and fell "between the rail and the couch." R. 61. Bolar stated that he looked at the victim after the shooting and saw that "[s]tuff was hanging out of his head." R. 62. Larry McGee, who was present at the scene, but who did not witness the shooting, had earlier testified without objection that after he heard shots fired, he "went out to look and saw [the victim] laying on the other side of the porch with the brains laying out of his head." R. 28. While State's Exhibit 3 is not pleasant to view, it clearly illustrates and corroborates the testimony of Bolar and McGee and, consequently, was properly admitted. See Ex parte Bankhead, 585 So.2d at 118; McElroy's § 207.01(2).
 B
Dr. Gary Simmons, the forensic pathologist who performed the autopsy on the victim, testified that the victim died from a gunshot wound to the head. He described this wound as "a large through-and-through gunshot wound to the left side of the head, which basically entered where my finger is and left the temple region and exited on the back left side of the head." R. 102. Dr. Simmons identified State's Exhibits 6 through 11 as photographs that were made from slides that were taken at his direction during the autopsy of the victim.[2] On voir dire examination by defense counsel, Dr. Simmons stated: "The photographs are pictures of the actual wound and actual location of the wound on the deceased, Mr. Watkins. They would basically illustrate the points I was making, showing the actual wound itself as opposed to pointing on my head." R. 104-05. He then explained:
 "Some [of the photographs] are before the wound was altered. Some are after the wound was cleaned up. And the entrance wound, for example, part of the entrance wound is sewn together to show the actual entrance wound because the entrance wound had large skin splits. I sewed some of those to try to show the location of the entrance itself as opposed to the damage sec[ond]ary to the bone being broken and splitting the skin."
R. 105. Dr. Simmons concluded, "[The photographs] will help me explain the angle of the wound and so forth." Id. The photographs were admitted into evidence and Dr. Simmons was permitted to use the slides during his testimony over the appellant's objections that Exhibit 8 was repetitious of Exhibit 7, that Exhibit 11 was repetitious of Exhibit 10, and that the prejudicial effect of the photographs outweighed their probative value.
While Exhibit 8 does depict some of the same details as Exhibit 7 and while Exhibit 11 depicts some of the same details as Exhibit 10, each of the photographs was used by Dr. Simmons to illustrate a different point. Dr. Simmons testified that Exhibit 7 was an "as-is picture," showing the victim "as he arrived at the coroner's office," then explained that Exhibit 8 was taken "to demonstrate the lack of what is called stippling or soot deposi[ta]tion." R. 109-10. We observe that Exhibit 8 appears to have been taken at a closer range than Exhibit 7. Dr. Simmons stated that Exhibit 10 "was taken for the *Page 76 
purpose of getting some idea of the true entrance wound and also the exit wound." R. 112. Exhibit 10 depicts the entrance wound after Dr. Simmons had directed that "some of the skin [be] sewn together." R. 113. Exhibit 11 depicts only the exit wound, which was described by Dr. Simmons as "a typical exit wound." R. 113.
"[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters." Ex parteSiebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied,497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). In this case, Exhibits 8 and 11 clearly illustrated the testimony of the pathologist and demonstrated the extent of the victim's injuries; therefore, there was no error in the admission of these photographs. See Jackson v. State, [Ms. CR 91-820, September 30, 1993] 1993 WL 381491 (Ala.Cr.App. 1993); Hawkinsv. State, 594 So.2d 181, 186 (Ala.Cr.App. 1991); Dabbs v.State, 518 So.2d 825, 829 (Ala.Cr.App. 1987).
 III
The appellant maintains that the trial court erred in refusing to permit him to introduce evidence of the victim's bad character.
The appellant called his then 16-year-old brother as the first defense witness. During direct examination of this witness, defense counsel asked, "Do you know what the reputation is of [the victim] as being a law-abiding moral citizen in the community?" R. 120. The State's objection to this question was properly sustained.
Where a defendant accused of murder raises a claim of self-defense, he "may prove the victim's bad general reputation for peace and quiet, violence or like trait existing prior to the alleged offense." C. Gamble,McElroy's Alabama Evidence §§ 33.01(1), 63.01(1) (4th ed. 1991). However, evidence of the victim's bad general reputation "is admissible only if the evidence before the trial court, at the time such general reputation is offered, tends to show that the accused acted in self-defense." Id. § 33.01(2) (emphasis added). Accord Reed v. State, 595 So.2d 554, 555
(Ala.Cr.App. 1991) ("[a]fter a defendant presents some evidencetending to show that he acted in self-defense, he is then entitled to offer proof of the violent and bloodthirsty nature of the deceased") (emphasis added). At the time the appellant's brother testified, there was absolutely no evidence of self-defense before the trial court — the testimony of the State's witnesses clearly would not support a claim of self-defense and the appellant's brother did not witness the events in question. The only evidence of self-defense is found in the testimony of the appellant, who was the last defense witness. Consequently, evidence of the victim's bad character was not admissible until that testimony had been offered by the appellant.
Moreover, a defendant "is not entitled to prove the victim's bad general reputation as a whole. . . . He can only prove the victim's bad reputation for violence or some similar trait." McElroy's § 33.01(9). Accord Holliday v. State,346 So.2d 26, 27 (Ala.Cr.App. 1977) (admissible evidence of victim's bad character "has not been extended to 'general reputation' but is limited to reputation as to particular traits variously denominated as traits of 'violence,' 'turbulence,' 'blood-thirstiness' and the like"). See alsoMcElroy's §§ 63.01(1), 33.01(4). The question posed to the appellant's brother was improper because the inquiry was not limited to a particular bad trait of the victim. See Hollomanv. State, 349 So.2d 131, 133 (Ala.Cr.App. 1977).
The appellant also complains that he was not permitted to offer evidence that the victim had been selling drugs in front of the appellant's mother's house. Evidence that the victim sold drugs does not establish "the victim's bad reputation for violence or some similar trait," and is irrelevant in a murder prosecution. See Winton v. State,563 So.2d 22, 24 (Ala.Cr.App. 1990). Despite this principle, we note that when asked by defense counsel on direct examination to "explain . . . what type of problems [he had] had" with the victim and Bolar prior to the shooting, the appellant replied, "They would sit in front of my mother's house and sell drugs." R. 139. *Page 77 
The State's objection, which was made after the question was answered, was overruled.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] We note that "[s]elf-defense and accident are inconsistent defenses." Bradford v. State, 512 So.2d 134, 137
(Ala.Cr.App. 1987).
[2] We note that State's Exhibit 6 is an identification photograph showing the full face of the victim and containing certain information from the medical examiner's office. The gunshot wound to the victim's head is not visible in this photograph. Thus, there were actually only five "autopsy" photographs.