Rel: May 5, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2022-2023

————————————————

### CR-20-1006

————————————————

**Tyreese Nikita Crayton**

**v.**

**State of Alabama**

**Appeal from Jefferson Circuit Court**
**(CC-19-3305 and CC-19-3306)**

McCOOL, Judge.

Tyreese Nikita Crayton appeals his convictions for provocation manslaughter, see § 13A-6-3(a)(2), Ala. Code 1975, and attempted murder, see § 13A-4-2 and § 13A-6-2, Ala. Code 1975. Pursuant to the Habitual Felony Offender Act ("the HFOA"), see § 13A-5-9, Ala. Code

1975, Crayton was sentenced to life imprisonment for his manslaughter conviction and to life imprisonment without the possibility of parole for his attempted-murder conviction.

Facts and Procedural History

At the time of the events giving rise to this case, Crayton and Kendra Fitts lived in the same apartment complex, and Fitts had paid Crayton $400 to repair her car. On October 22, 2018, Fitts and her boyfriend, Tarius Richardson, saw Crayton outside Fitts's apartment, and Fitts told Crayton that she had purchased the parts needed to repair the car and asked him when the car would be repaired. However, according to Fitts, Crayton told her "that he wasn't going to be working on [her] car anymore" and "proceeded to turn around" and walk away. (R. 92.) Fitts then began arguing with Crayton because she had already paid him to repair the car, and she testified that, at that point, Crayton "turned around with [a] gun out saying he wasn't going to argue" and "put [the gun] in [her] face." (R. 94.) According to Fitts, Richardson "became upset" when Crayton pointed the gun at her and told Crayton to "[p]ut the gun down" (R. 97), which Crayton refused to do. Fitts testified that Richardson "couldn't do really too much," though, other than argue

2

with Crayton, because she was holding him by the sleeve of his jacket. (R. 98.)

It was around that time that Crayton's mother, who also lived in the apartment complex, came out of her apartment and "stepped in front of" Crayton and "tried to defuse the situation." (R. 96.) According to Fitts, while she was explaining the situation to Crayton's mother, Richardson "snatched his arm away from [her], and that's when the shots started coming." (R. 98.) Fitts testified that she saw the first shot strike Richardson "like a wrecking ball," which caused him to fall, and that she then began running toward her apartment. (R. 100.) Fitts testified that Crayton also shot at her as she was running. As to what happened when she reached her apartment, Fitts testified:

> "I turned around and that's when I seen him – [Richardson] was still laying down on the ground and [Crayton] walked up to [him] and stood over him. I don't know what he – I thought [Crayton] was firing into [Richardson's] body. I don't know exactly what he was shooting at, but [Crayton] stood over [Richardson] and I seen him shoot more."

(R. 103.)

It is undisputed that Richardson died from multiple gunshot wounds he sustained during the incident. Fitts was also injured during the incident when a bullet "grazed … [her] leg" (R. 103), although it was

3

not until after an ambulance arrived that she realized she had been shot, and, thus, she could not be certain exactly when the injury had occurred. (R. 103-04.) Regarding the extent of her injury, Fitts testified that medical personnel at a hospital "removed the [bullet] fragments out of [her] leg" and "told [her] that the other fragments w[ould] fall out." (R. 151.) By the time of trial, the remaining bullet fragments had in fact "fallen out" (id.), and Fitts testified that she has no residual pain in her leg and that the use of her leg has not been impaired by the gunshot wound. (R. 153.)

Other residents of the apartment complex witnessed the incident and testified to what they observed. Nicole Dobbins heard the argument from her bedroom, and, when she looked outside, she saw Crayton, Crayton's mother, Fitts, and Richardson. According to Dobbins, at that point Fitts was standing in front of Richardson and Crayton's mother was standing in front of Crayton, "as if holding them back" from each other (R. 28), and it appeared to Dobbins that Richardson "was trying to advance" toward Crayton and that Fitts "was trying to keep him from advancing." (R. 39.) Dobbins testified, though, that Richardson eventually "stepped out from behind [Fitts] and [Crayton] stepped out

4

from behind his mom and shot," and Richardson "went down." (R. 28.) According to Dobbins, the first shot appeared to have been aimed toward the ground, and she believed that Richardson had been shot in his leg because he "bent over and grabbed his leg or shin and went down," at which point Fitts "ran off." (Id.) Dobbins testified that, after Richardson fell, Crayton "went up to him and … shot him four or five times." (R. 30.)

Thomas Green also heard the argument from his apartment, which prompted him to step outside. Regarding what he observed, Green testified:

"Q. Once you walked outside, could you hear what was being said?

"A. Just commotion about he wasn't fixing no motor. He wasn't fixing the car.

"Q. Who wasn't fixing the car?

"A. [Crayton].

"Q. Okay. Was it still just [Fitts] and [Crayton], at this point, arguing?

"A. Correct.

"Q. At some point, did you see [Richardson], kind of, become involved in the argument?

"A. [Richardson] didn't get involved into the argument until [Crayton] pulled the gun.

5

"Q. Okay. What happened after – to get [Richardson] involved – after [Crayton] pulled the gun? How did [Richardson] become involved?

"A. Mainly, [Richardson] was saying, like, 'Why did you pull a gun on my girlfriend? Put the gun down and fight like a man.' That's when he came in.

"....

"Q. Okay. Was [Crayton] saying anything back to [Richardson] when he was saying that?

"A. He was just, 'I'm not trying to fight. I'm not trying to fight. I'm not fixing to fix no one's car.'

"....

"Q. Okay. How close … were [Richardson] and [Crayton] to each other when [Richardson] became involved in the argument?

"A. It was, like, arm reach.

"Q. Okay. Where was [Fitts] at this time?

"A. They was all in, like, a little huddle. All of them was sitting right there together.

"Q. All right. At any point, did you see [Richardson] make any physical contact with [Crayton]?

"A. No, sir.

"Q. Did you see [Fitts] make any physical contact with [Crayton]?

6

"A.  No, sir.

"Q.  At any point, did you see [Crayton's mother] outside?

"A.  I can't remember.

"Q.  Okay.  I want you to tell us – and we need to go through it step by step.  I want you to tell us exactly what happened when [Crayton] started shooting?  Was there something that happened that caused the shooting to start, or describe that for us?

"A.  Well, I guess they was just – I don't know, it was so long ago.  It was just a bunch of arguing.  Arguing, 'I'm not fixing no car.'  I know I heard [Richardson] say that he had somebody else to fix the car.  By that time the pistol was drawn.  [Richardson] and [Crayton] started arguing and that's when shots were fired.

"Q.  Okay.  Tell us what happened when the shots were fired?  Who fired the shots?

"A.  [Crayton].

"Q.  Could you see who he was shooting at?

"A.  He was shooting at [Richardson].

"Q.  How do you know that?

"A.  That's where the gun was aimed at.

"Q.  Okay.

"A.  Three people outside.  [Crayton was] the only one with a gun.  He was aiming at [Richardson].

7

"Q. Okay. And when he shot at [Richardson], did he hit [Richardson]?

"A. Yes.

"Q. And what did [Richardson] do after he was shot by [Crayton]?

"....

"A. Dropped. He hit the ground.

"Q. What happened after [Richardson] hit the ground?

"A. [Crayton] turned the gun on [Fitts].

"....

"Q. And what happened next?

"A. He started shooting at her and turned back around and continued shooting at [Richardson].

"Q. Where did [Fitts] go? You said he turned the gun on [Fitts]. Where was [Fitts] after the shooting started? What did she do?

"A. She was running, like, back to the front of the apartment complex.

"Q. Towards where you were standing?

"A. Yeah. She was running away from him towards the front of the apartment complex.

"Q. Okay. And you said [Crayton] turned the gun on her, is that correct?

"A. Correct.

"Q. Did he shoot at [Fitts]?

"A. Yes.

"Q. Do you remember how many times?

"A. No, sir.

"Q. Okay. What happened after he shot at [Fitts]?

"A. He went back and commenced at shooting at [Richardson].

"Q. How close to [Richardson] was he when he went back to commence the shooting?

"A. Standing right over him.

"Q. And where was [Richardson]?

"A. On the ground.

"Q. Do you remember how many times [Crayton] shot [Richardson] while [Richardson] was on the ground?

"A. No, sir.

"Q. Was [Richardson] – when he was on the ground, was he moving? Was he making motions towards [Crayton]? Was he doing anything when [Crayton] was shooting him on the ground?

"A. Not that I can remember."

(R. 63-68.)

9

Bobby Sanders provided a somewhat different version of the incident, which he observed from his second-story apartment. Sanders testified that, during the time that Crayton's mother was between Crayton and Richardson, Richardson "was trying to get to [Crayton]" (R. 310) and that Richardson eventually said that, "if he couldn't get to [Crayton], he was going to get [Crayton's mother]. And that's when [Richardson] reached out and grabbed [Crayton's mother] on the arm and snatched her back." (R. 311.) According to Sanders, it was not until Richardson "snatched" Crayton's mother that "the shooting started." (R. 314.) Crayton's mother corroborated Sanders's testimony, testifying that Richardson "grabbed [her] arm" (R. 338) and that, "[w]hen [Richardson] yanked [her]," Crayton "came around shooting, trying to get [Richardson] off of [her]." (R. 342.)

Cpl. Deanna Marshall of the Jefferson County Sheriff's Office responded to the incident and was informed by dispatch that Crayton "had fled the scene." (R. 170.) After a brief search, Cpl. Marshall and a deputy found Crayton on an apartment balcony in "the next apartment complex over," where, according to Cpl. Marshall, Crayton "was trying to hide." (R. 173.)

In September 2019, a Jefferson County grand jury returned indictments charging Crayton with the intentional murder of Richardson and the attempted murder of Fitts. At the close of the State's evidence, Crayton moved for a judgment of acquittal on both charges. The trial court denied Crayton's motion and submitted the case to the jury, along with instructions on self-defense, provocation manslaughter as a lesser-included offense of intentional murder, and second-degree assault as a lesser-included offense of attempted murder. Crayton also requested that the jury be instructed on third-degree assault as a lesser-included offense of attempted murder, but the trial court refused to give that instruction. As noted, the jury convicted Crayton of provocation manslaughter and attempted murder.

Before the sentencing hearing, Crayton filed a "motion for judgment of acquittal … [and] to declare [the] sentencing scheme unconstitutional." (C. 344.) As to his motion for a judgment of acquittal, Crayton argued that the jury had returned mutually exclusive verdicts by finding him guilty of both provocation manslaughter and attempted murder. As to his sentencing claim, Crayton argued that he was facing "a sentencing range of 20 years to life in prison" for his attempted-murder conviction

11

and that, because Fitts had "suffered a relatively minor physical injury," any sentence in that range would be grossly disproportionate to the crime and therefore unconstitutional. (C. 349.) In its response to Crayton's motion, the State indicated that it would be seeking to have Crayton sentenced under the HFOA and that, based upon his three prior felony convictions, the only sentencing options for his attempted-murder conviction were life imprisonment or life imprisonment without the possibility of parole. Crayton subsequently supplemented his motion, arguing that either of those sentences would certainly be grossly disproportionate to his crime of attempted murder.

Five days later, the trial court held the sentencing hearing. At the beginning of the hearing, the State provided the trial court with certified copies of Crayton's three prior felony convictions. After hearing testimony and the arguments of counsel, the trial court denied Crayton's postjudgment motion and, pursuant to the HFOA, sentenced him to life imprisonment for his manslaughter conviction and to life imprisonment without the possibility of parole for his attempted-murder conviction.

Following the sentencing hearing, Crayton filed a motion for new trial in which he continued to argue that his life-imprisonment-without-

parole sentence for his attempted-murder conviction is grossly disproportionate to the crime and therefore unconstitutional. The trial court denied that motion, and Crayton filed a timely notice of appeal.

Discussion

On appeal, Crayton raises several claims that challenge his convictions and one claim that challenges his life-imprisonment-without-parole sentence on the attempted-murder conviction. We address each claim in turn.

I.

Crayton argues that the State's evidence was not sufficient to prove a prima facie case of attempted murder; thus, he argues, the trial court should have granted his motion for a judgment of acquittal on that charge.

> "'"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. ...."
>
> "'Powe v. State, 597 So. 2d 721, 724 (Ala. 1991) (citations omitted).

>>> """'In Alabama a person commits the crime of attempt to murder if he intends to cause the death of another person and does any overt act towards the commission of that intent. Alabama Code 1975, Sections 13A-4-2 (the attempt statute), and 13A-6-2 (murder).' Chaney v. State, 417 So. 2d 625, 626-27 (Ala. Crim. App. 1982). See also Barnes v. State, 571 So. 2d 372, 374 (Ala. Crim. App. 1990). 'Attempted murder is a specific intent crime .... An attempt to commit murder requires the perpetrator to act with the specific intent to commit murder .... A general felonious intent is not sufficient.' Free v. State, 455 So. 2d 137, 147 (Ala. Crim. App. 1984)."

> "'Minshew v. State, 594 So. 2d 703, 704 (Ala. Crim. App. 1991). "'While proof of the intent to murder is an element of the burden of proof resting on the [S]tate, this intent is not susceptible of positive proof, but rests in inference to be drawn by the jury from all the evidence in the case.'" Id. at 708, quoting Williams v. State, 13 Ala. App. 133, 137, 69 So. 376, 377 (1915). Intent may be presumed from the use of a deadly weapon, the character of the assault, and other attendant circumstances surrounding the assault. Chaney v. State, 417 So. 2d 625 (Ala. Crim. App. 1982). Furthermore, "[t]he question of intent in an attempt case 'belong[s] exclusively to the jury to decide.'" Minshew, 594 So. 2d at 708, quoting United States v. Quincy, 31 U.S. (6 Pet.) 445, 8 L. Ed. 458 (1832).'

"Wells v. State, 768 So. 2d 412, 415 (Ala. Crim. App. 1999)."

14

<u>Varnado v. State</u>, 352 So. 3d 777, 782-83 (Ala. Crim. App. 2021).

According to Crayton, the State's evidence was not sufficient to prove a prima facie case of attempted murder because, he says, the State failed to prove that he had the specific intent to kill Fitts.  In making this argument, Crayton concedes that the State presented evidence indicating that he "turned [his] gun toward Fitts and fired at her" (Crayton's brief, p. 22), and it is well settled that " '[i]ntent may be inferred from the use of a deadly weapon.' "  <u>Henderson v. State</u>, 248 So. 3d 992, 1007 (Ala. Crim. App. 2017) (quoting <u>Waldrop v. State</u>, 859 So. 2d 1138, 1162 (Ala. Crim. App. 2000)).  Nevertheless, Crayton argues that, for two reasons, the State's evidence was not sufficient to prove that he had the intent to kill Fitts.

First, Crayton argues that "[t]he idea that intent can be inferred from the use of a deadly weapon is an oversimplified and misleading interpretation of Alabama law."  (Crayton's brief, p. 25.)  According to Crayton, the use of a deadly weapon is merely one factor to consider in determining whether a defendant had the intent to kill but, standing alone, is not sufficient evidence of that intent.  In support of that argument, Crayton cites multiple cases that, he says, demonstrate that

"this Court always tackles sufficiency-of-the-evidence issues in attempted-murder ... cases by evaluating a complete picture of the circumstances" and "has not been convinced by [the defendant's use of a] deadly weapon ... alone and should not have tunnel vision on such a complex issue."[1]  (Id. at 35, 36.)

Contrary to Crayton's contention, nothing in the cases he cites provides or even suggests that a defendant's use of a deadly weapon, standing alone, is not sufficient evidence of the defendant's intent to kill. In fact, in at least two of those cases, as well as other cases not cited by Crayton, this Court explicitly held that the fact that the defendant had used a deadly weapon against the victim was in and of itself sufficient evidence of the defendant's intent to kill.  See Barnes v. State, 571 So. 2d 372, 375 (Ala. Crim. App. 1990) ("In this case, the State presented ample evidence from which the jury reasonably could have inferred that Barnes

---

[1]Those cases include Cockrell v. State, 890 So. 2d 168 (Ala. Crim. App. 2003); Wells v. State, 768 So. 2d 412 (Ala. Crim. App. 1999); Freeman v. State, 722 So. 2d 806 (Ala. Crim. App. 1998); Buskey v. State, 650 So. 2d 605 (Ala. Crim. App. 1994); Perry v. State, 647 So. 2d 71 (Ala. Crim. App. 1994); Crews v. State, 616 So. 2d 392 (Ala. Crim. App. 1993); Barnes v. State, 571 So. 2d 372 (Ala. Crim. App. 1990); Benton v. State, 536 So. 2d 162 (Ala. Crim. App. 1988); Breeding v. State, 523 So. 2d 496 (Ala. Crim. App. 1987); Free v. State, 495 So. 2d 1147 (Ala. Crim. App. 1986); and Chaney v. State, 417 So. 2d 625 (Ala. Crim. App. 1982).

intended to kill Mrs. Sanford: the eyewitnesses, Mr. and Mrs. Sanford, testified that Barnes crouched and aimed a revolver at Mrs. Sanford and that Barnes fired one shot from the revolver into the door of the truck in which Mrs. Sanford was sitting."); Crews v. State, 616 So. 2d 392, 394 (Ala. Crim. App. 1993) (holding that the evidence was sufficient to sustain the defendant's murder conviction and, with respect to the element of intent, noting that proof of that element was "supplied by the use of the deadly weapon"); Hinkle v. State, 67 So. 3d 161, 164 (Ala. Crim. App. 2010) ("[B]y demonstrating that Hinkle used a handgun to shoot and kill Caneshua, the State produced sufficient evidence from which the jury could infer that Hinkle acted with the requisite intent to murder Caneshua."); Horton v. State, 217 So. 3d 27, 52 (Ala. Crim. App. 2016) ("In this case, it was undisputed that Romprey was shot twice in the head with a revolver. The intent to kill could easily be inferred by the use of a deadly weapon."); and Towles v. State, 263 So. 3d 1076, 1086 (Ala. Crim. App. 2018) ("The evidence indicates that Towles, a grown man, used a deadly weapon to strike and eventually kill a five-year-old boy. Those facts are sufficient for the jury to infer that Towles intended to kill [the boy]."). Therefore, the evidence indicating that Crayton deliberately fired

17

a gun at Fitts was sufficient, in and of itself, to prove that he intended to kill her.

Second, Crayton argues that there was insufficient evidence of his intent to kill Fitts if this Court considers other factors, including "[his] calm demeanor toward Fitts, [his] lack of threats, and the fact that her injury was a mere graze near her foot" (Crayton's brief, p. 36); he also argues that the evidence indicated that Fitts might have been inadvertently shot when he was shooting at Richardson. According to Crayton, those factors demonstrate that he did not have the intent to kill Fitts. However, we have already explained that the evidence indicating that Crayton deliberately fired a gun at Fitts was sufficient, in and of itself, to prove that he intended to kill her. The fact that there was other evidence that arguably supported a finding that Crayton did not have the intent to kill Fitts goes to the <u>weight</u> of the evidence, not its sufficiency, and created a question of fact for the jury to resolve.[2] <u>See</u> <u>Gargis v. State</u>, 998 So. 2d 1092, 1097 (Ala. Crim. App. 2007) ("Inconsistencies,

---

[2]Crayton has not expressly raised a weight-of-the-evidence claim on appeal, nor did he raise such a claim in his postjudgment motions. <u>See</u> <u>Rudolph v. State</u>, 200 So. 3d 1186, 1189 (Ala. Crim. App. 2015) (noting that a weight-of-the-evidence claim is not preserved for appellate review unless it is first raised in a motion for a new trial).

contradictions, and conflicts in the evidence go to the weight of the evidence and create fact questions that must be resolved by the jury.").

In sum, the State presented evidence indicating that Crayton deliberately fired a gun at Fitts, and that evidence was sufficient to prove that Crayton intended to kill Fitts and that he committed an overt act toward doing so. The ultimate determination regarding Crayton's intent was a question for the jury to resolve, as questions of intent almost always are. Abrams v. State, 331 So. 3d 1184, 1191 (Ala. Crim. App. 2021). Thus, the trial court properly denied Crayton's motion for a judgment of acquittal on the attempted-murder charge.

Crayton also argues in this part of his brief that the trial court "left the possibility that the jury inadvertently appl[ied] a wrongful theory of transferred intent" to find him guilty of attempted murder. (Crayton's brief, p. 43.) According to Crayton, the doctrine of transferred intent "cannot apply to attempted murder in Alabama" (id.), and he argues that, as a result, the jury was required to conduct "[a] specific-intent analysis … for each victim." (Id. at 45.) However, Crayton did not raise this claim in the trial court and thus failed to preserve it for appellate review. See Collier v. State, 293 So. 3d 961, 965 (Ala. Crim. App. 2019) (noting that

a trial court will not be put in error on a ground not raised at trial). Moreover, we fail to see why the jury would have applied the doctrine of transferred intent to find Crayton guilty of the attempted murder of Fitts. The trial court did not give a transferred-intent instruction and, instead, explicitly instructed the jury that, to find Crayton guilty of attempted murder, it had to find that he "intended to commit the crime of murder of Kendra Fitts." (R. 419.) We presume the jury followed that instruction, Anderson v. State, [Ms. CR-20-0568, Feb. 11, 2022] ___ So. 3d ___, ___ (Ala. Crim. App. 2022), and therefore presume that the jury's guilty verdict on the attempted-murder charge was based on its finding that Crayton had the specific intent to kill Fitts. Accordingly, Crayton is not entitled to relief on this claim.

## II.

Crayton argues that the trial court erred by refusing to instruct the jury on second-degree assault and third-degree assault as lesser-included offenses of attempted murder. In addressing whether the trial court should have given those instructions, we are guided by the following well settled principles:

> "'A defendant has the right to request a jury charge based upon any material hypothesis that

the evidence tends to establish, and where there is a reasonable theory to support a requested charge as a lesser-included offense, a trial court's refusal to give the charge is reversible error.  See <u>Ex parte Chavers</u>, 361 So. 2d 1106 (Ala. 1978); <u>Miller v. State</u>, 675 So. 2d 534 (Ala. Crim. App. 1996).  A court may, however, properly refuse to charge on a lesser-included offense "(1) when it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) when the requested charge would have a tendency to mislead or confuse the jury." <u>Chavers</u>, 361 So. 2d at 1107 ….  Furthermore, § 13A-1-9(b), Ala. Code 1975, states that "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."'

"<u>Ryan v. State</u>, 865 So. 2d 1239, 1244 (Ala. Crim. App. 2003)."

<u>Culver v. State</u>, 22 So. 3d 499, 525-26 (Ala. Crim. App. 2008) (emphasis omitted).

## A. Second-Degree Assault

Section 13A-6-21, Ala. Code 1975, provides, in relevant part:

"(a) A person commits the crime of assault in the second degree if the person does any of the following:

"(1) With intent to cause serious physical injury to another person, he or she causes serious physical injury to any person.

"(2) With intent to cause physical injury to another person, he or she causes physical injury to

21

any person by means of a deadly weapon or a dangerous instrument.

"(3) He or she recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument."

Thus, "second[-]degree assault … can be accomplished by either intentional or reckless actions." Johnson v. State, 651 So. 2d 1085, 1086 (Ala. Crim. App. 1994).

In this case, the trial court instructed the jury on second-degree assault pursuant to § 13A-6-21(a)(2), i.e., intentionally causing physical injury by means of a deadly weapon or dangerous instrument. Crayton argues, however, that the trial court should have also instructed the jury on second-degree assault pursuant to § 13A-6-21(a)(3), i.e., recklessly causing serious physical injury by means of a deadly weapon or dangerous instrument. According to Crayton, that instruction was warranted because, he says, the evidence supported a "reasonable theory" that "Fitts sustained [her] injury due to shots fired at Richardson," given that multiple shots "were fired in close succession toward Richardson" and that Fitts was "in exceedingly close proximity" to Richardson. (Crayton's brief, p. 50.)

22

There are two problems with Crayton's argument. First, although Crayton argues that Fitts might have been inadvertently shot when he was shooting at Richardson, there was no <u>evidence</u> to support that finding. None of the bystander witnesses testified that they observed Fitts being struck by the bullet, and Fitts herself testified that she did not even realize she had been shot until after an ambulance arrived on the scene. Plus, there was evidence indicating that Crayton deliberately shot at Fitts as she was running from the scene, after he fired the initial shots at Richardson. Thus, Crayton's argument that Fitts might have been inadvertently shot is purely speculative, and it is well settled that "[t]he basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture." <u>Broadnax v. State</u>, 825 So. 2d 134, 200 (Ala. Crim. App. 2000).

Second, even if the evidence left no doubt that Fitts was inadvertently shot when Crayton was shooting at Richardson, Crayton did not dispute that he intentionally shot Richardson; in fact, his claim that he shot Richardson in self-defense was an admission that he intentionally shot Richardson. <u>See</u> <u>Bohannon v. State</u>, 222 So. 3d 457,

512 (Ala. Crim. App. 2015) ("'"It is a well accepted principle of law that a claim of self-defense necessarily serves as an admission that one's conduct was intentional .... [A] person simply cannot ... recklessly defend himself."'" (quoting Gurley v. State, 639 So. 2d 557, 560 (Ala. Crim. App. 1993), quoting in turn Lacy v. State, 629 So. 2d 688, 689 (Ala. Crim. App. 1993) (emphasis omitted))). That fact is significant because "'[t]he doctrine of transferred intent is applicable in prosecutions for assault,'" Hubbard v. State, 324 So. 3d 855, 870 (Ala. Crim. App. 2019) (quoting Mathis v. State, 497 So. 2d 231, 232 (Ala. Crim. App. 1986)), which means that, if Fitts was shot when Crayton was intentionally shooting at Richardson, then, from a legal perspective, Crayton intentionally injured Fitts.

This Court reached the same conclusion in Hubbard, supra. In that case, two men were shot with an assault rifle while sitting in a parked vehicle at an apartment complex; the driver died as a result of his wounds, and the passenger suffered severe injuries. The evidence indicated that the defendant and his accomplices had lured the driver of the vehicle to the apartment complex in order to kill him, and the defendant was convicted of capital murder for the driver's death. The

defendant was also found guilty of first-degree assault for the injuries inflicted on the passenger. On appeal, the defendant argued that there was insufficient evidence to sustain his conviction for first-degree assault because, he said, that conviction required evidence indicating that he had the specific intent to harm the passenger, and there was no evidence indicating that he even knew that the passenger was in the vehicle. This Court rejected that argument, explaining that the evidence supported a finding that the defendant intended to kill the driver and that, as a result, it was "irrelevant" that the defendant "may not have known of [the passenger's] presence in [the] vehicle or may not have intended for [the passenger] to be injured during the shooting." Hubbard, 324 So. 3d at 870. In other words, under the doctrine of transferred intent, the defendant's intent to cause harm to the driver supported a finding that the defendant also intentionally caused the passenger's injuries, even if those injuries might have been, factually speaking, inadvertent.

In this case, the evidence indicated that Fitts was shot either when Crayton was intentionally shooting at her or when he was intentionally shooting at Richardson. Either way, that evidence supported only one conclusion: from a legal perspective, Crayton intentionally caused Fitts's

25

injury. The fact that Crayton might not have been aiming at Fitts when she was injured is "irrelevant." Hubbard, 324 So. 3d at 870. Thus, because the evidence supported a finding that Crayton intentionally injured Fitts, the trial court did not err by refusing to instruct the jury on reckless second-degree assault as a lesser-included offense of attempted murder.

## B. Third-Degree Assault

Section 13A-6-22, Ala. Code 1975, provides, in relevant part:

> "(a) A person commits the crime of assault in the third degree if:
>
> > "(1) With intent to cause physical injury to another person, he causes physical injury to any person; or
>
> > "(2) He recklessly causes physical injury to another person; or
>
> > "(3) With criminal negligence he causes physical injury to another person by means of a deadly weapon or a dangerous instrument."

Crayton argues that the trial court should have instructed the jury on third-degree assault, "both reckless and negligent forms," because he continues to argue that Fitts might have been inadvertently shot when he was shooting at Richardson. (Crayton's brief, p. 53.) However,

Crayton was not entitled to those instructions for the same reason he was not entitled to an instruction on reckless second-degree assault. To reiterate, under the doctrine of transferred intent, any harm Crayton caused to Fitts while he was intentionally shooting at Richardson was intentional harm. Thus, the trial court did not err by refusing to instruct the jury on the reckless and criminally-negligent forms of third-degree assault as lesser-included offenses of attempted murder.

### III.

Crayton argues that the trial court erred by instructing the jury that, if it found that he had fled the scene, his flight could be construed as evidence of his consciousness of guilt. (R. 411.) In support of that argument, Crayton notes that he "was immediately apprehended in an area adjacent to the scene" and that his "best efforts at hiding involved sitting on a porch in plain sight." (Crayton's brief, pp. 58-59.) Thus, Crayton argues, the State "presented no actual evidence of flight to warrant a jury instruction allowing the jury to infer a consciousness of guilt." (Id. at 59.)

We disagree. The evidence indicated that Crayton was not found at the scene of the incident but, instead, was found on the balcony of an

27

apartment in "the next apartment complex over," and Cpl. Marshall testified that Crayton "was trying to hide" on the balcony. Those facts supported a finding that Crayton fled the scene and attempted to avoid being discovered by law enforcement. Thus, the trial court did not err by giving a flight instruction. The facts that Crayton fled only a short distance and that his attempt to hide was unsuccessful do not change that conclusion. See Smith v. State, 795 So. 2d 788, 829 (Ala. Crim. App. 2000) ("'[T]here can be no set or specific time necessary to constitute flight, and the distance the accused ran before he was apprehended is also immaterial.'" (quoting Muse v. State, 29 Ala. App. 271, 274, 196 So. 148, 150 (1940))); and Player v. State, 568 So. 2d 370, 373 (Ala. Crim. App. 1990) (holding that a flight instruction was supported by evidence indicating that the defendant had attempted to hide from law enforcement in a closet but had been discovered).

IV.

Crayton argues that the jury returned mutually exclusive verdicts by finding him guilty of both provocation manslaughter and attempted murder.

"Regarding mutually exclusive verdicts, the Alabama Supreme Court has explained:

28

> "'[M]utually exclusive verdicts are the result of two positive findings of fact that cannot logically coexist. In other words, it is legally impossible for the State to prove the elements of both crimes. In order to determine whether the guilty verdicts are mutually exclusive as a matter of law, the alleged underlying offenses or acts must be carefully scrutinized. The two guilty verdicts are not mutually exclusive if no element of one crime necessarily negates an element of the other.'

"Heard v. State, 999 So. 2d 992, 1004-05 (Ala. 2007)."

Washington v. State, 214 So. 3d 1225, 1229 (Ala. Crim. App. 2015).

The jury's verdicts in this case are not mutually exclusive. First, both provocation manslaughter and attempted murder are specific-intent crimes. See Carter v. State, 843 So. 2d 812, 815 (Ala. 2002) (noting that provocation manslaughter is an intentional killing); and Varnado, 352 So. 3d at 783 ("Attempted murder is a specific intent crime." (citations omitted)). Thus, this is not a case where the jury "f[ound] two distinct mental states for one course of conduct." Carter, 843 So. 2d at 815. In addition to the specific intent to kill, Crayton's provocation-manslaughter conviction required proof that he killed Richardson under "'the heat of passion … caused by a provocation recognized by law,'" Williams v. State, 351 So. 3d 559, 563 (Ala. Crim. App. 2021) (quoting Turner v. State, 708

29

So. 2d 232, 234 (Ala. Crim. App. 1997)), whereas Crayton's attempted-murder conviction required proof that he committed an "overt act towards the commission of" that offense. § 13A-4-2(a). Thus, no element of either offense negated an element of the other offense. In other words, the jury could logically and legally find that Crayton intended to kill Richardson and did so under the heat of passion caused by a provocation recognized by law and also find that Crayton intended to kill Fitts and committed an overt act toward doing so. Accordingly, the jury's verdicts are not mutually exclusive. See Carter, supra (holding that the jury had not returned mutually exclusive verdicts by finding the defendant guilty of provocation manslaughter and intentional murder for two killings committed in the same course of conduct); and Washington, supra (holding that the jury's verdicts were not mutually exclusive because no element of either offense negated an element of the other offense).

Despite the foregoing analysis, Crayton argues that the jury's verdicts are nevertheless mutually exclusive. In support of that argument, Crayton notes that the jury found that his killing of Richardson was mitigated from intentional murder to manslaughter by virtue of Richardson's provocation but did not find that his attempt to

murder Fitts was mitigated to a lesser offense, even though, he says, there was evidence indicating that Fitts also provoked him. In other words, Crayton argues that because, he says, both victims provoked him, "the jury's positive findings of fact of provocation in the murder case cannot logically coexist with a lack of such finding in the attempted-murder case, making the verdicts in these cases mutually exclusive." (Crayton's brief, p. 65.) However, Crayton makes no attempt to explain how a finding of provocation could have legally mitigated the attempted-murder charge. See Varnado, 352 So. 3d at 783 (noting that it is an open question "'whether attempted heat-of-passion manslaughter is an offense in Alabama'" (quoting Rogers v. State, 819 So. 2d 643, 662 (Ala. Crim. App. 2001))). Moreover, the premise of Crayton's argument is flawed because, as we explain in Part V, infra, there was no evidence indicating that Fitts committed "a provocation recognized by law." Williams, 351 So. 3d at 563. Thus, there is no merit to this argument.

## V.

Finally, Crayton argues that his sentence of life imprisonment without the possibility of parole, which was imposed pursuant to the HFOA, is grossly disproportionate to his crime of attempted murder and

31

therefore constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and Article I, § 15, of the Alabama Constitution. In making this argument, Crayton concedes that, "in noncapital cases, successful challenges to the proportionality of sentences [are] 'exceedingly rare,'" Wilson v. State, 830 So. 2d 765, 772 (Ala. Crim. App. 2001) (quoting Rummel v. Estelle, 445 U.S. 263, 272 (1980)), but he argues that his case is that "rare case." (Crayton's brief, p. 67.)

"At the outset, we acknowledge that determinations regarding the punishments to be imposed for different crimes are purely legislative," and this Court therefore "generally will not review sentences imposed within statutorily prescribed limits." Wilson, 830 So. 2d at 771. We also note that the HFOA has repeatedly been held to be constitutional. Tyler v. State, 683 So. 2d 1062, 1064 (Ala. Crim. App. 1995). Nevertheless, "'[t]he Eighth Amendment ... contains a "narrow proportionality principle" that "applies to noncapital sentences."'" Lane v. State, 66 So. 3d 830, 831 (Ala. Crim. App. 2010) (quoting Ewing v. California, 538 U.S. 11, 17 (2003), quoting in turn Harmelin v. Michigan, 501 U.S. 957, 996-97 (1991)). That narrow proportionality principle authorizes an appellate

court to review a sentence that is within the statutorily prescribed limits to ensure that the sentence is constitutional. See Adams v. State, 815 So. 2d 583, 585 (Ala. Crim. App. 2001) ("'"[A]ppellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights."'" (quoting Brown v. State, 611 So. 2d 1194, 1198 n.6 (Ala. Crim. App. 1992), quoting in turn Ex parte Maddox, 502 So. 2d 786 (Ala. 1986))).

"In order to analyze the constitutionality of [Crayton's] sentence, this Court must first make a threshold determination whether [Crayton's] sentence is grossly disproportionate to his crime." E.L.Y. v. State, 266 So. 3d 1125, 1132 (Ala. Crim. App. 2018).

> "'To perform this analysis, we must consider the gravity of the offense and the harshness of the punishment. Solem [v. Helm], 463 U.S. [277,] 290-91, 103 S. Ct. 3001 [(1983)]. The United States Supreme Court noted in Solem that no single factor determines when a sentence is grossly disproportionate, and it offered a nonexhaustive list of factors to be considered when a court is assessing the severity of a crime. These factors include consideration of the circumstances of the crime, the harm caused to the victim or to society, the culpability of the offender, and the offender's motive in committing the crime. Id. at 290-94, 103 S. Ct. 3001.'"

E.L.Y., 266 So. 3d at 1132-33 (quoting Wilson, 830 So. 2d at 778). Thus, we begin our proportionality review by considering the Solem v. Helm, 463 U.S. 277 (1983), factors.

We first note that the circumstances of Crayton's crime were extremely grave in that Fitts or someone else certainly could have been killed when Crayton "turned the gun on [her]" and "started shooting at her" in the middle of an apartment complex. Indeed, Crayton's attempt to murder Fitts evinces a complete disregard for the sanctity of life, and attempted murder is among the most serious crimes that can be committed in Alabama, as reflected by the legislature's decision to classify it as a violent offense, see § 12-25-32(15)a.2. and c., Ala. Code 1975, and a Class A felony, see § 13A-4-2(d)(1). See E.L.Y., 266 So. 3d at 1133 (noting that the legislature had classified the defendant's crime as a Class A felony, "the same classification given to crimes such as murder, rape, and first-degree robbery," in holding that the circumstances of the crime were "extremely grave").

As to the harm he caused, Crayton notes that Fitts suffered only a "superficial" injury (Crayton's brief, p. 42) – a fact that, he says, significantly reduces the gravity of his crime. However, in addressing

the same argument, the Vermont Supreme Court has held that an attempted-murder victim's lack of any serious physical harm is not a particularly relevant factor in judging the gravity of the crime. Specifically, the Court stated:

"Petitioner argues that the fact that the victims ultimately experienced little physical harm weighs in favor of a finding of disproportionality. The harm ultimately caused to the victim may, generally speaking, be a legitimate factor in judging the gravity of an offense. See Solem, 463 U.S. at 293, 103 S. Ct. 3001 (recognizing that '[t]he absolute magnitude of the crime may be relevant' in judging proportionality). <u>Lack of harm is a less compelling consideration, however, where the perpetrator intends to cause grave harm but fails solely due to external factors beyond his or her control</u>. State v. Alexander, 2005 VT 25, ¶ 9, 178 Vt. 482, 871 A.2d 972 (mem.) ('[D]efendant is asking to have a lesser penalty imposed because he was unsuccessful in committing a crime he clearly intended. We cannot say that sentencing this attempt crime in the same manner as the completed crime, as the Legislature has decreed, is constitutionally disproportionate.'). In the present case, petitioner freely admitted that he intended to kill the victim, and that he was only thwarted because several neighbors intervened. His culpability is not diminished by the fact that he failed to consummate the intended killing.

"This understanding of proportionality in attempt cases – that defendants may not be entitled to a lesser sentence simply because they failed to consummate the crime – is not new to Vermont law. It comports with the intent of the Legislature, which provided that attempted murder should be punished in the same manner as if the crime was completed. 13 V.S.A. § 9(a) ('If the offense attempted to be committed is

murder ... a person shall be punished as the offense attempted
to be committed is by law punishable.')."

In re Stevens, 195 Vt. 486, 491, 90 A.3d 910, 914 (2014) (emphasis added).

We find the reasoning of the Vermont Supreme Court to be persuasive. As that Court aptly pointed out, a defendant who attempts to murder someone certainly intends to cause grave harm – indeed, the gravest harm – and the fact that he was unsuccessful and inflicted only a "superficial" injury, or even no injury, does not diminish the gravity of what could have occurred. To put it another way, a defendant who attempts to kill his victim should not benefit in a proportionality review from poor aim or other circumstances that fortuitously resulted in little or no harm to the victim. Also, as we have already noted, our legislature has classified attempted murder as a Class A felony and, in doing so, has determined that attempted murder is among the most serious crimes that can be committed in Alabama and that it should be punished just as severely as murder, which is also a Class A felony, regardless of whether any injury actually results from the attempt. Thus, we agree with the Vermont Supreme Court. Although the harm (or lack of harm) caused to the victim is generally a factor to consider in determining the severity of the defendant's crime, that factor is "a less compelling consideration"

36

when the crime is attempted murder. In re Stevens, 195 Vt. at 491, 90 A.3d at 914.

As to his motive for committing the crime and his culpability, Crayton argues that he was provoked by Fitts. See Carter, 843 So. 2d at 815 n.2 (noting that "some motives for killing," including provocation, "are deemed criminally less culpable than other motives"). The evidence indicates, however, that Fitts merely argued with Crayton and that she might have been "touching him … on his head with her fingers" as he "was walking off." (R. 328.) Thus, there is no evidence indicating that Fitts committed "a provocation recognized by law," Williams, 351 So. 3d at 563 (citation omitted), because legal provocation cannot arise from "'mere words, no matter how insulting or abusive,'" Knight v. State, 907 So. 2d 470, 477 (Ala. Crim. App. 2004) (quoting Biggs v. State, 441 So. 2d 989, 992 (Ala. Crim. App. 1983)), nor can it arise from "'"[a] minor technical assault which did not endanger life or inflict serious physical injury or inflict substantial and considerable pain."'" Callen v. State, 284 So. 3d 177, 230 (Ala. Crim. App. 2017) (quoting Living v. State, 796 So. 2d 1121, 1130 (Ala. Crim. App. 2000), quoting in turn Shultz v. State, 480 So. 2d 73, 76 (Ala. Crim. App. 1985)). Furthermore, the evidence

indicated that, once Crayton brandished his gun, Fitts began attempting to deescalate the situation by "trying to push [Richardson] back, hollering 'no'" (R. 350-51), and that Crayton did not shoot at Fitts until she started running from the scene. Thus, for all that appears from the evidence, Crayton's attempt to murder Fitts was a completely senseless and unmotivated attack. Accordingly, we find no basis for concluding that Crayton's culpability for that crime was diminished.

Having addressed the Solem factors, we acknowledge two other factors that, Crayton says, indicate that his life-imprisonment-without-parole sentence is grossly disproportionate to his crime of attempted murder. See E.L.Y., 266 So. 3d at 1133 (noting that the Solem factors were not intended to be an "exhaustive list"). First, Crayton points to the fact that he was "sentence[d] … to life in prison for the death of a person, yet [life imprisonment without the possibility of parole] for the minor leg injury Fitts sustained." (Crayton's brief, p. 69.) In a related argument, Crayton argues that the trial court "did not have the option to consider the voluntary [sentencing] guidelines as to the attempted-murder conviction but did have that option on the provocation-manslaughter conviction." (Id. at 69-70.) However, Crayton cites no authority

38

providing that a factor to consider in conducting a proportionality review is <u>another</u> sentence that the defendant received for <u>another</u> crime. Thus, we do not consider these arguments in our analysis. See <u>Alabama Psychiatric Servs., P.C. v. Lazenby</u>, 292 So. 3d 295, 302 n.1 (Ala. 2019) (refusing to consider an argument for which the appellants had cited no authority).

Second, Crayton notes that his two prior convictions for first-degree possession of marijuana, which were used to enhance his sentences, were classified as a Class C felony when he committed them, but he argues that, as of January 30, 2016, those crimes would have been classified as a Class D felony. A Class D felony cannot be used to enhance a sentence under the HFOA. <u>Justo v. State</u>, 306 So. 3d 63, 64 (Ala. Crim. App. 2019). Thus, Crayton argues, "[a] person with the exact same criminal history [and] with the exact same convictions simply could not be sentenced to [life imprisonment without the possibility of parole] if his or her marijuana-related priors occurred after [January 30,] 2016." (Crayton's brief, pp. 71-72.) In other words, Crayton asks this Court to consider in its proportionality review the sentence that could be imposed on similarly situated offenders in Alabama.

As a threshold matter, we note that the premise of Crayton's argument is flawed. Crayton correctly notes that § 13A-12-213, Ala. Code 1975, was amended effective January 30, 2016, to provide that some first-degree-possession-of-marijuana offenses would henceforth be Class D felonies. See Act No. 2015-185, Ala. Acts 2015. However, some first-degree-possession-of-marijuana offenses are still Class C felonies, depending on the circumstances, see § 13A-12-213, and the circumstances of Crayton's possession-of-marijuana offenses are not clear from the record.[3] Thus, as far as this Court can determine, it is possible that Crayton's possession-of-marijuana offenses would have been Class C felonies regardless of when they were committed, and, contrary to Crayton's contention, it is therefore possible that "[a] person with the exact same criminal history [and] with the exact same convictions" could be sentenced to life imprisonment without the possibility of parole.

---

[3]The State alleges that Crayton's possession-of-marijuana offenses would "still [be] a Class C felony to this day" (State's brief, p. 26), but that allegation is neither confirmed nor refuted by the record provided to this Court.

40

Furthermore, even if Crayton is correct, in determining whether a statutorily authorized sentence is unconstitutional, an appellate court must

> "first make a threshold determination whether the … sentence … is 'grossly disproportionate' to the crime. If it is determined that the sentence is grossly disproportionate to the crime, then the reviewing court must go further and 'conduct a full-scale proportionality review, examining the second and third Solem factors.' [Wilson, 830 So. 2d] at 780, citing Harmelin [v. Michigan], 501 U.S. [957,] 1005, 111 S. Ct. at 2707 [(1991)]. Those additional 'Solem factors' require the court to examine the punishment imposed on other offenders in the same jurisdiction and the punishment the offender would have received had the crime been committed in another jurisdiction."

E.L.Y., 266 So. 3d at 1132 (emphasis added). In other words, in conducting a proportionality review, an appellate court considers the punishment imposed on other offenders in the same jurisdiction only if the court first makes the threshold determination that the defendant's sentence is grossly disproportionate to the crime. Consequently, at this point of our review, the sentences that have been or could be imposed on similarly situated offenders in Alabama is not a relevant factor. See id. at 1134 ("[W]e do not conclude that E.L.Y.'s sentence is grossly disproportionate to his crime. Accordingly, we need not examine the remaining Solem factors."); and Wilson, 830 So. 2d at 780 (holding that,

41

because the defendant's sentence was grossly disproportionate to her crime, the Court was required to "go further and conduct a full-scale proportionality review, examining the second and third Solem factors").

As we noted at the outset of our analysis, in determining whether Crayton's life-imprisonment-without-parole sentence is grossly disproportionate to his crime of attempted murder, this Court "must consider the gravity of the offense and the harshness of the punishment." E.L.Y., 266 So. 3d at 1132-33 (citation omitted). A life-imprisonment-without-parole sentence is "the second most severe sentence available in this State (the most severe being the death penalty)," so Crayton's punishment is certainly harsh. Wilson, 830 So. 2d at 779. However, Crayton's violent crime of attempted murder is among the most serious crimes that can be committed in Alabama, and there are no factors that tend to diminish the severity of his crime or otherwise support a finding that his sentence is grossly disproportionate to his crime. Accordingly, we cannot say that this is one of the "exceedingly rare" cases in which the defendant's legislatively sanctioned sentence is unconstitutional. Wilson, 830 So. 2d at 772 (citation omitted). See E.L.Y., 266 So. 3d at 1133-34 (holding that the defendant's life-imprisonment-without-parole

42

sentence for a Class A felony was not grossly disproportionate to his crime after concluding that none of the factors identified in <u>Solem</u>, nor any other factor cited by the defendant, tended to diminish the severity of his crime).

Conclusion

Crayton has not provided this Court with any basis for reversing his convictions or sentences. Accordingly, the judgment of the trial court is affirmed.

AFFIRMED.

Windom, P.J., and Kellum, Cole, and Minor, JJ., concur.